Millard K. MILLS et al., Plaintiff-Respondents,

v.

Robert K. MURRAY et al., Defendants-Appellants.

No. 25512.

Kansas City Court of Appeals, Missouri.

Oct. 4, 1971.

Brown, Wright & Willbrand, H. C. Willbrand, Columbia, for defendants-appellants.

Lathrop, Koontz, Righter, Clagett, Parker & Norquist, Thomas J. Wheatley, Maurice J. O'Sullivan, Jr., Kansas City, Smith, Lewis & Rogers, Columbia, for plaintiffs-respondents.

SHANGLER, Presiding Judge.

Plaintiffs, a co-partnership doing business as Professional Management Midwest (PMM), sued defendants Robert K. Murray, Richard F. Rudolph, Jr. and Professional Consulting Services, Inc. (PCS) for an injunction to enforce the restrictive covenants in contracts of employment and to recover damages for their breach and for an accounting.

Plaintiffs provide business and management services for medical, osteopathic and dental practitioners in eleven states, including Missouri. Defendants Murray and Rudolph were formerly employed by PMM as business consultants to a number of such professional practitioners. As an incident to employment, each had agreed by the restrictive covenant provisions, paragraph 13, of his contract of employment with PMM that:

"(b) * * * if his employment terminates for any cause after he has been employed for ninety (90) days, he will not, for a period of three (3) years thereafter solicit, contract for or render the same or similar services to any individual, firm, partnership, association or corporation who or which has been, within one (1) year prior to the date of such termination, a client of PMM serviced either by Employee or by a Consultant supervised by Employee."

Defendant PCS commenced its corporate life as a competitor of PMM on the very day Murray left plaintiffs' employ. Murray was the sole incorporator of PCS, its sole stockholder, and its President. Within weeks, Rudolph was hired away from PMM by Murray to work as a consultant with PCS.

Plaintiffs' action proceeded on the theory that despite its corporate guise, defendant PCS was actually the alter ego of defendant Murray and was the vehicle whereby all three defendants gave full scope to their conspiracy to breach the restrictive covenants of defendant Murray's contract with PMM by the artifice of hiring defendant Rudolph as a corporate employee who, then, at Murray's direction, was to solicit certain of PMM's clients formerly serviced by Murray and contract with them in the corporate name, all within the proscribed contractual periods. The issues were tried to the court which explicitly found the restrictive covenant provisions of Murray's (and Rudolph's) contract(s) reasonable, and therefore enforceable, and that the defendants had wilfully and maliciously conspired to breach the restrictive provisions of Murray's contract. No breach of Rudolph's contract was found, nor, apparently, was the need for an accounting established. Defendants were permanently enjoined from further violation of the Murray covenant and plaintiffs were awarded actual and punitive damages against all the defendants. From this judgment defendants appeal.

PMM is among the oldest, and is now the largest, concern engaged in offering business management services for practitioners of medicine and dentistry. The management consultation services it provides relate principally to the business aspects of the doctors' practices and include advice on taxation, insurance, credit and collection, office procedure and management, and generally, all matters which bear on their professional and personal financing. These services are furnished through management consultants, such as Murray

and Rudolph, who are employed by PMM to solicit, contract with, and personally consult with clients on a periodic and continuing basis. These consultants were chosen with some care and only after testing, screening and personal interviews with PMM management. A newly-employed consultant submits to a regimen of supervised field training before he may service clients and is furnished an instructional manual devised by PMM to accelerate learning and productivity. Once engaged, the management consultant tends to become intimately acquainted with the doctors whom he serves and with the details of their professional and, at times, personal lives as well. It is not unusual for consultants to gather with clients for social events. And only when requested by a consultant does a supervisor of PMM call on a client for any purpose. As it was aptly put by plaintiff Glenn Kreamer, PMM field manager: "The Consultant in the field is Professional Management Midwest. * * * He is our company."

Defendant Murray was employed by PMM as a management consultant on April 1, 1965 and executed the employment contract containing the post-employment restrictive covenant provision with which we deal on November 20, 1965. After the customary period of training he was assigned to solicit and service clients in central, eastern and northeastern Missouri. Murray became a skilled consultant, highly regarded by his clients and so valued by his employer that when a vacancy occurred in St. Louis, he was offered the position of supervisor but declined it because it would require him to leave Columbia. There were thirty-six doctors and dentists for whom Murray, as an employee of PMM, had performed consulting services within the year of the termination of his employment with PMM. Murray consulted with each of them during his monthly visits on the range of subjects we have described and on other specific matters as investments, public relations and training office personnel. By the Spring of 1968, Murray

had determined to leave PMM and establish a competing business to be known as "Professional Consulting Service, Inc." While still in the employ of PMM, he executed Articles of Incorporation as sole incorporator. The Articles issued from the Secretary of State of Missouri on May 31, 1968, and on that date Murray left PMM.

Appellant Rudolph was employed by PMM as a management consultant for the Topeka, Kansas area on December 1, 1967 and then terminated his employment on July 15, 1968. He read and executed an employment contract which contained the identical post-employment restrictive covenant as appears in Murray's contract and which, he was told, all management consultants were obliged to execute. Although plaintiffs pleaded that Rudolph had breached the restrictive covenant of his contract, none was proved. The judgment taken against Rudolph, and from which he appeals, is for his participation in the conspiracy to breach the Murray restrictive covenant. In mid-May of 1968, Murray telephoned Rudolph, told him he had resigned from PMM, that he was starting his own competing firm, that he needed an additional man, and asked Rudolph if he would be interested in discussing it further. They arranged to meet in Kansas City on May 31, 1968. At that meeting Murray depicted the want of adequate consulting services in central and eastern Missouri and the large number of doctors needful of them, laid out his plans for a competing business in that area and their promise for success. Murray then told Rudolph he intended to solicit for business and that he was going to call on clients he had previously serviced for PMM to advise them he was starting his own competing business but that he felt he was "restricted by contract with his previous employer from working these clients". Rudolph began working for Murray and PCS the day after he left PMM.

During May of 1968, while still in the employ of PMM, Murray personally had called on each but one of the thirty-six

clients he was then servicing for PMM and solicited their business for PCS. He told each he was leaving PMM and was "setting up (his) own company". They were made to understand that although he, himself, could not service them thereafter because of the restrictive provisions of his contract with PMM, PCS would provide the same service and that he would have a representative of his company, PCS, call on them. Further solicitation by brochure and on PCS letterhead personally signed by Murray as "business consultant" followed.

Within thirteen days of the start of his employment with PCS, Rudolph had signed seventeen doctors formerly serviced by Murray for PMM, within the year of his leaving, to contracts with PCS. Rudolph, in turn, knew that Murray had "set up" appointments with doctors whom Murray had serviced previously as clients of PMM within the year of his leaving PMM, and thus within the strictures of the restrictive covenant provision of his employment contract, PCS entered into service contracts with twenty-one of them.

Defendants contend, first of all, that plaintiffs failed to sustain their burden of proving that the restraint imposed by Murray's employment contract was reasonable in that there was no explicit testimony that the prescribed three-year, or any other, period of time was essential to protect the employer's interest. The courts recognize that a restrictive covenant which limits a person in the pursuit of his occupation is in restraint of trade, is not to be favorably regarded, and that the burden of establishing its validity by showing it is reasonable rests upon the party claiming its benefit. Prentice v. Rowe, Mo.App., 324 S.W.2d 457, 461 [2, 3.] However, the question of reasonableness of such a covenant not to compete is not one of fact but of law for the court according to the subject matter of the covenant and the circumstances

shown to exist. American Pamcor, Inc. v. Klote, Mo.App., 438 S.W.2d 287, 290 [2]; Mallinckrodt Chemical Works v. Nemnich, 83 Mo.App. 6, 28. "There are certain elements which should always be considered in ascertaining the reasonableness of such agreements in employment cases, among which are the consideration supporting the agreements,[1] the threatened danger to the employer in the absence of such an agreement, the economic hardship imposed on the employee by such a covenant, and whether or not such a covenant would be inimical to the public interest." 54 Am. Jur.2d, Monopolies, Etc., Sec. 543; Corbin on Contracts, Sec. 1394; Annotation, 41 A.L.R.2d 15, 33; Prentice v. Rowe, 324 S.W.2d l.c. 461 [1]; Renwood Food Products v. Schaefer, 240 Mo.App. 939, 223 S. W.2d 144, 151 [1]. To be reasonable and enforceable, post-employment restrictions generally must be qualified as to time and area and must be no greater than fairly required to protect the employer. Farmers Underwriters Association v. Reid, Mo. App., 425 S.W.2d 247, 252 [3]; City Ice and Fuel Co. v. Snell, Mo.App., 57 S.W.2d 440, 442.

The Murray restrictive covenant imposes no spatial restraint since no territory is interdicted to his competition. The only limitation imposed is that of time, so that for three years after leaving PMM Murray may not solicit, contract with or service those for whom he had rendered comparable services during the last year of his employment with PMM. Such a restriction we find reasonably necessary to protect PMM which hired and paid Murray to solicit clients and then, by the very necessities of the business, was required to stand aloof while a relationship of confidence developed between Murray and the customers of the business, thus enhancing the risk that Murray could entice them away when he left PMM's employ. Under the circumstances it was not unreasonable to

1. There is no contention here that the restrictive covenant lacks good consideration or is not otherwise incidental to and in support of a lawful contract of employment. See: City Ice and Fuel Co. v. Snell, 57 S.W.2d l. c. 442 [4, 5].

anticipate that three years must pass before Murray's former clients are no longer subject to the influence of their former relationship. It is universally recognized that an employer has a proprietary right in his stock of customers and their good will and, if otherwise reasonable, the courts will protect this asset against appropriation by an employee by the enforcement of such a restrictive covenant not to compete. Renwood Food Products v. Schaefer, 223 S.W.2d l.c. 152 [4]; Prentice v. Rowe, l.c. 462 [5]; Oxman v. Profitt, 241 S.C. 28, 126 S.E.2d 852; Pilgrim Coat, Apron & Linen Service v. Krzywulak, 141 N.J.Eq. 212, 56 A.2d 584, 586 [4]; 53 Am.Jur.2d, Master and Servant, Sec. 108; Corbin on Contracts, Sec. 1394, p. 98. The time limitation imposed by the Murray covenant was no more than necessary to protect the employer's legitimate interest.

Under the circumstances of this case, the restrictive covenant is reasonable to Murray as well as to his employer. Since it imposed no territorial restraint, Murray was free to conduct a competing business at plaintiffs' doorstep as soon as he left PMM's service, and that is what he actually did. The practical effect of the time limitation imposed was to prevent Murray from soliciting and contracting with thirty-six doctors for a period of three years, an insignificant economic deprival in view of the evidence of 8000 doctors practicing in Missouri and that Murray, himself, was prompted to start a competing business because of the "large market" ready for such services. The restraint of the restrictive covenant, limited as it is only as to time, is less stringent than many others imposing limitations of space as well as time (some up to five years) in non-competition and non-solicitation covenants of employment contracts which have been upheld and enforced by our appellate courts. See, among others: Haysler v. Butterfield, 240 Mo.App. 733, 218 S.W.2d 129, 131 [4]; R. E. Harrington, Inc. v. Frick, Mo.App., 428 S.W.2d 945, 949 [5]; Garlichs Agency Co. v. Anderson, Mo.App., 226 S.W. 978, 980

[2]; Thompson v. Allain, Mo.App., 377 S.W.2d 465, 466 [1, 2]; Farmers Underwriters v. Reid, 425 S.W.2d l.c. 249; American Pamcor, Inc. v. Klote, 438 S.W.2d l.c. 289 [1, 2]. We find the restrictive covenant reasonable to the employer, the employee, not inimical to the public interest and therefore enforceable in equity by injunction. Mo.Digest, Injunctions, ▬▬▬.

The validity of defendants' further complaints that the trial court erred in finding actual and punitive damages against them and in enjoining them is to be determined by whether the evidence supports plaintiffs' theory of recovery, expressly declared by the trial court as the basis for its judgment, that defendants executed their conspiracy to induce a breach of the Murray restrictive covenant with plaintiffs to damnifying results.

▬▬▬ A civil conspiracy is an agreement or understanding between two or more persons to do an unlawful act, or to use unlawful means to do an act which is lawful. Royster v. Baker, Mo., 365 S.W.2d 496, 499 [2]; Shaltupsky v. Brown Shoe Co., 350 Mo. 831, 168 S.W.2d 1083, 1084 [1]. Since the primary purpose of a civil conspiracy is to cause injury to another, the gist of the action is not the conspiracy, but the wrong done by acts in furtherance of the conspiracy or concerted design resulting in damage to plaintiff. Contour Chair Lounge Co. v. Aljean Furniture Mfg. Co., Mo.App., 403 S.W.2d 922, 926 [1–4]; Rosen v. Alside, Inc., Mo., 248 S.W.2d 638, 643 [1–5]. Strictly speaking, the fact of conspiracy is not actionable, there is no distinct writ of conspiracy, but the action sounds in tort and is in the nature of an action on the case upon the wrong done under the conspiracy alleged. Byers Bros. Real Estate & Ins. Agency v. Campbell, Mo.App., 353 S.W.2d 102, 105 [1–3]; Stevens v. Rowe, 59 N.H. 578, 47 Am.Rep. 231. Conspirators are joint tortfeasors and each is jointly and severally liable for all damages naturally flowing from the conspiracy, each defendant is made responsible for the acts of the other in pursuance

of the common design. Wooldridge v. Scott County Milling Co., Mo.App., 102 S.W.2d 958, 964 [2, 3]; 15A C.J.S. Conspiracy § 18. But a conspiracy does not give rise to a civil action unless something is done pursuant to which, absent the conspiracy, would create a right of action against one of the defendants, if sued alone. Rosen v. Alside, Inc., 248 S.W.2d l.c. 643 [5]; Darrow v. Briggs, 261 Mo. 244, 169 S.W. 118, 125 [5]. "The fact of a conspiracy merely bears on the liability of the various defendants as joint tort-feasors." Royster v. Baker, 365 S.W.2d l.c. 500 [2-4.]

■ In the case before us plaintiffs seek to vindicate their right to the performance of the restrictive covenant provision of their employment contract with Murray and their right to enjoy its benefits. These are rights which the courts recognize and protect. "(T)he intentional interference with the contractual relation without just cause so as to effect a breach of the contract is a wrong for which the wrongdoer may be held accountable in damages." Downey v. United Weather Proofing, 363 Mo. 852, 253 S.W.2d 976, 980 [5]; Clark-Lami, Inc. v. Cord, Mo., 440 S.W.2d 737, 741 [8, 9]; Cady v. Hartford Acc. & Indemnity Co., Mo., 439 S.W.2d 483, 485 [3]; Baruch v. Beech Aircraft Corporation, (10th C.C.A.) 175 F.2d 1, 2 [1]. And a person who conspires with another to induce an unjustified violation of his contract with a third person commits an actionable wrong. Rosen v. Alside, Inc., 248 S.W.2d l.c. 643 [4]; Byers Bros. Real Estate & Insurance Agency, Inc. v. Campbell, 353 S.W.2d l.c. 105 [1-3]; 16 Am. Jur.2d, Conspiracy, Sec. 50; 15A C.J.S. Conspiracy § 13. This rule has been extended in numerous cases, by persuasive reasoning, to hold one liable for conspiring to breach his own contract. See particularly, Wise v. Southern Pacific Company, 223 Cal.App.2d 50, 35 Cal.Rptr. 652, 660 [20, 21]; Worrie v. Boze, 198 Va. 533, 95 S.E.2d 192, 198 [8] and the cases there cited.

■■ A conspiracy must be proved by clear and convincing evidence. National Rejectors, Inc. v. Trieman, Mo., 409 S.W. 2d 1, 50 [36, 38]. Assuming for the moment damages have been proved, plaintiffs have carried that burden. They have shown by the evidence we have already detailed—virtually all of which comes from the deposition testimony of defendants Murray and Rudolph given in evidence by plaintiffs—that each defendant, with full knowledge of the existence and effect of the restrictive covenant agreement between Murray and PMM, intentionally and without justification conspired to induce its breach and to interfere with plaintiffs' right to be free from Murray's solicitation and competition according to the contractual terms of the covenant. Downey v. United Weather Proofing, 253 S.W.2d l.c. 980 [5]; Restatement, Torts, Sec. 766. An actionable civil conspiracy having been proved, Murray, Rudolph and PCS became jointly and severally liable for the resulting damages to plaintiffs. Baucke v. Adams, 239 Mo.App. 84, 188 S.W.2d 355, 367 [5, 6]; Restatement, Torts, Sec. 876.

■ The evidence of the overt participation, and hence liability, of Murray and Rudolph in the consummation of this scheme is explicit enough. We confirm the corporate liability of PCS in the civil conspiracy, not on any theory of agency between Murray or Rudolph and PCS, nor yet on the alter ego theory which plaintiffs have so insistently asserted.[2] The liability

2. Under the alter ego or "instrumentality" rule, when a corporation comes under the domination of another person (as plaintiffs contend between PCS and Murray), as to have become a mere instrument of that person, and is really indistinct from the person controlling it, then the corporate form will be disregarded if to retain it results in injustice. National Bond Finance Company v. General Motors Corporation, (U.S.D.C., W.D.Mo.) 238 F. Supp. 248, 255(3); Superior Coal Co. v. Department of Finance, 377 Ill. 282, 36 N.E.2d 354, 360. The application of this

we fasten on PCS derives from its own active participation as a joint tortfeasor. The conspiracy in which Murray enlisted Rudolph and PCS was designed not only to breach the Murray covenant with PMM, but also to insulate Murray from any liability for the breach. (The arguments of defendants and Murray's deposition testimony make that quite plain.) To further that objective, Rudolph became a PCS employee and contracted with the proscribed former clients of PMM in the corporate name. PCS had no legitimate interest in the violation of Murray's personal contract with PMM nor did Murray or Rudolph advance any corporate purpose in doing so. Each acted from motive of personal advantage; Rudolph for the commissions to be earned by contracting with former PMM clients, Murray and PCS for the continuing services fees to be realized. Without the participation of PCS as a corporate entity, the scheme of conspiracy could have been neither concocted nor achieved.

◼ The trial court found all three defendants had wilfully and maliciously conspired to breach the Murray restrictive covenant and awarded plaintiffs both actual and punitive damages. Compensatory damages were assessed against defendant Murray and Professional Consulting Services, Inc. for $2,594.00 and against Rudolph for $1.00. Punitive damages were assessed against defendants Murray and Professional Consulting Services, Inc. for $7500.00 and against defendant Rudolph for $100.00. The judgment for compensatory damages is palpably improper. The establishment of the conspiracy made all three defendants, severally and jointly, equally liable as joint tortfeasors and the judgment for all actual damage resulting from the conspiracy must be in one amount and against all who were not discharged. Byers Bros.

Real Estate & Ins. Agency, Inc. v. Campbell, 353 S.W.2d l.c. 397 [6]; 15A C.J.S. Conspiracy § 18. The rule is otherwise as to punitive damages which may be properly determined against joint tortfeasors in differing amounts, depending, among other factors, upon the degree of the culpability of each. State ex rel. Hall v. Cook, Mo., 400 S.W.2d 39, 41 [3–5]. On this appeal, of course, we review the evidence de novo and will enter that judgment which is conformable to law. The only serious contention defendants do make as to the judgment for damages is that evidence of actual damage was totally lacking and therefore neither actual nor punitive damages could be properly awarded.

Plaintiffs' proof of actual damages consisted of the testimony of PMM assistant general manager Glenn C. Kreamer, who is an accountant, and plaintiffs' Exhibit 62, compiled by Kreamer from the PMM clients assertedly lost to PCS through the improper solicitations and the monthly books and records, and which showed the service fees payable by each to PMM. The gross receipts payable by these clients over the three-year restrictive period were shown to be $55,170.00. To arrive at the net profit loss, Kreamer deducted 40% for salaries incident to the acquisition and servicing of clients, 10% for travel expenses and 5% for other miscellaneous expenses. The remaining 45% or $25,826.50 was claimed as the net profit loss incurred by PMM on account of the loss of clients. Defendants objected to Exhibit 62 and this testimony based on it for several reasons, but particularly because "(t)here (was) no showing that these clients would have remained with them". The trial court noted the objections, expressed its tentative disinclination to admit the evidence, but received it as an offer of proof, allowed to

rule under these facts would be neither equitable nor congenial to plaintiffs' theory of recovery, for it would require us to treat Murray as the only perpetrator of the wrong, and as without distinct individuality from PCS and therefore without capacity for conspiring with each

other. In any event, the alter ego rule has no application when, as here, the corporation itself has committed a direct tort. Lowendahl v. Baltimore & O. R. Co., 247 App.Div. 144, 287 N.Y.S. 62, 76 [8].

plaintiffs full scope to develop their inquiry and to defendants full scope for cross-examination, and took the objections with the case.

Defendants developed on cross-examination, however, that if the salaries of the supervisory personnel and the costs of operation of the other departments of the business had been taken into account, the resultant net profit would be only 10% of the gross receipts, $5,517.00 in this case.

On re-direct examination, Kreamer undertook to establish an alternative method of computing plaintiffs' net profit loss by showing in some detail, that based upon the experience of Murray's last year with PMM, the actual cost of the billings he generated was all but 21.12% of the total. Applying this formula to the gross revenues payable over the three year restrictive period by the clients lost to PCS, the 21.-12% profit PMM would have realized, but in fact lost, was calculated at $11,647.87. Defendants objected to this testimony for much the same reasons as before, and the court sustained the objection to the evidence which, it appears, had been received, once again, as an offer of proof. Defendants did not cross-examine.

From its Findings of Fact, it is evident the court adopted the net profit theory elicited by defendants in their cross-examination of Kreamer. The court found that as the result of defendants' illicit activities in violation of the Murray restrictive covenant, PMM had lost nineteen (rather than the twenty-one or twenty-two claimed) former clients to PCS and that the gross amounts payable by them (which were specified as to each) from the dates of their contracts with PCS until January 1, 1970, when judgment was entered, totalled $25,940.00. The court also found that plaintiffs could have reasonably anticipated a net profit of 10% of the gross revenues and, accordingly, found their actual damages to be $2,594.00.

■ Before proceeding to defendants' contention of the insufficiency of the evidence to support the judgment entered on this finding, we notice another complaint defendants direct to another finding of fact. The trial court found it had erred in sustaining defendants' objections to the testimony of Kreamer as to plaintiffs' loss of profits as to Exhibit 62, changed these rulings, and received this evidence. Defendants do not object to the source of the information contained in the exhibit or the mode of its preparation, but only to its relevancy. To that we say only that in the examination of this case the exhibit, a summary of names of former clients of PMM, the dates on which they were lost to PCS, and the fees payable by each to PMM constituted information indispensible to plaintiffs' proof of lost profits by any acceptable method and therefore highly relevant.

■ Defendants contend also that the court's action in first sustaining their trial objections to Kreamer's loss of profits testimony, thus rendering defendants' cross-examination superfluous, and then in admitting the testimony when giving judgment, effectively deprived them of their right of cross-examination which they would have otherwise exercised. Kreamer's loss of profits testimony ranges through one hundred pages of transcript testimony, fully thirty of which are taken up by defendants' cross-examination on damages. Absent transcript page references, we can only surmise that defendants mean to refer to Kreamer's re-direct examination testimony wherein he undertook to establish the alternative, or 21.12% net profit, method for determination of plaintiffs' damages and to which the court sustained defendants' objection. It is not clear whether the court intended this testimony, also, be received as an offer of proof, although the procedures adopted at the trial with respect to Kreamer's other damage testimony, as well as the court's language during the colloquy with counsel, have led us to that in-

ference. In any event, defendants were not harmed nor did the court commit error affecting the merits because it is obvious that it was not Kreamer's theory, but the 10% net profit theory introduced into the case by defendants, themselves, which the court adopted as the basis for its judgment of actual damages, and therefore defendants are in no position to complain.

In determining whether plaintiffs have proved actual damage, and thus their cause of action for conspiracy to induce breach of their restrictive covenant, we note that, "(g)enerally, the measure of damages for procuring the breach of a contract 'is the loss either of property or of personal benefit, which except for such interference, the plaintiff would have been able to attain or enjoy, including such loss of profits as the plaintiff can prove to have resulted directly and proximately from the wrongful acts.' 30 Am.Jur. Interference, Sec. 59, p. 94." Coonis v. Rogers, Mo., 429 S.W.2d 709, 714 [2–5]. Plaintiffs' claim to actual damages derives exclusively from the loss of anticipated profits. Since "(e)xpected profits are in their nature contingent upon many changing circumstances, uncertain and remote at best. * * * (t)hey may be recovered only when they are made reasonably certain by proof of actual facts, with present data for a rational estimate of their amount; and, when this is made to appear, they may be recoverable". Morrow v. Missouri Pac. Ry. Co., 140 Mo.App. 200, 123 S.W. 1034, 1039; Anderson v. Abernathy, Mo., 339 S.W.2d 817, 824 [5–7]. The loss of profits which plaintiffs may claim as the result of the breach of their contract is the loss of *net* profits, that amount plaintiffs would have realized in the usual course of business if their clients had not been lost to PCS through defendants' activities. Morrow v. Missouri Pac. Ry. Co., 123 S.W. 1.c. 1039; Red-E-Gas Company v. Meadows, Mo.App., 360 S.W. 2d 236, 240 [4, 5]. And, indispensible to a determination of net profits is proof of income and expenses as they relate to the

subject of the loss. Fuchs v. Curran Carbonizing and Engineering Co., Mo.App., 279 S.W.2d 211, 219 [16, 17].

Plaintiffs' evidence of net loss was derived from its books and records, which appear to have been the most reliable source of proof available to them. The precise total of the fees payable by each of the clients lost to PCS was given as were the categories of expense both as to the general operation of the business and as allocable to Murray's typical production. This data was presented and interpreted by Kreamer, an experienced accountant, and, except in cross-examination, was completely uncontested by defendants. This proof furnished a basis for the rational estimate of the loss of anticipated profits resulting from defendants' activity. In awarding $2,594.00 as compensatory damages, the court did not allow loss of anticipated profits for the entire three year restrictive period, but confined recovery to the loss which had accrued to the date of the decree. The compensatory damages allowed by the trial court were proved to a reasonable certainty and we adopt the finding.

Defendants contend that the award for actual damages is nonetheless speculative because based on the assumption that the clients serviced by Murray for PMM would have remained with PMM after Murray's departure, whereas, in fact, these clients would have left PMM with Murray's leaving, irrespective of any wrongdoing. But if that be so, it is only because of defendants' wrong that the damages cannot be determined with more certainty and defendants will not be heard to say, on that account, that plaintiffs may not have full relief for the injury defendants inflicted on them. Shechter v. Brewer, Mo.App., 344 S.W.2d 784, 791 [7]; City of Kennett v. Katz Constr. Co., Mo., 202 S.W. 558, 562 [7]. A similar contention in closely analogous circumstances was presented in DeLong Corporation v. Lucas, (2d C.C.A.) 278 F.2d 804. The question before the court was whether or not Lucas was liable

to DeLong for loss of estimated profits resulting from the breach by Lucas of an agreement not to compete with DeLong, his former employer. Lucas had helped DeLong develop self-elevating off-shore drilling platforms and jacking mechanisms. After he left DeLong, but within the restrictive period, Lucas entered into an arrangement whereby Morrison-Knudsen Company was to advance to him $100,000 for developing Lucas' idea for self-elevating mechanisms, distinctively different from those developed at DeLong. Morrison-Knudsen and DeLong bid for a Navy contract to construct three Texas Towers and largely because the Lucas jacking mechanism cost considerably less to construct than those of other designs, Morrison-Knudsen was able to successfully outbid DeLong and was awarded the contract. The trial court held Lucas' activities with Morrison-Knudsen violated the non-competition clause of their agreement and that the breach was the proximate cause of the loss of the Navy contract. The trial court also found DeLong had been damaged in the amount of its estimated profits from the venture. The appellate court affirmed the trial court and expressly rejected defendant's contention that plaintiff was required to show that Morrison-Knudsen could not possibly have been the successful bidder but for Lucas' contract violation, l.c. 810, 811:

> "Where the wrong 'itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate.' "

See, also: Terminal Vegetable Co. v. Beck, 8 Ohio App.2d 231, 196 N.E.2d 109, 112

[5]. We believe it may fairly be said that whatever uncertainty inhered in the proof of damages for the breach of such a covenant was within the contemplation of the parties at the time it was executed. Mayfield v. George O. Richardson Machinery Co., 208 Mo.App. 206, 231 S.W. 288, 298 [7]; Tirry v. Hogan, 181 Mo.App. 48, 163 S.W. 873, 876.

Defendants also complain that it was error to have awarded plaintiffs punitive damages because there was no evidence that the acts of defendants were willful, wanton or malicious. This argument tacitly recognizes the principle of law that since a civil conspiracy to induce the breach of a contract sounds in tort, it may carry with it the assessment of punitive damages if done with malice or wantonness. Byers Bros. Real Estate & Insurance Agency, Inc. v. Campbell, 353 S.W. 2d l.c. 105 [4–7]; Worrie v. Boze, 95 S.E. 2d l.c. 200 [14]; 16 Am.Jur.2d, Conspiracy, Sec. 64; 15A C.J.S. Conspiracy § 33. "The test to be applied in determining whether malice existed as a basis for the award of punitive damages is whether the defendant did a wrongful act intentionally and without just cause or excuse. 'This means that defendant not only intended to do the act which is ascertained to be wrongful but that he knew it was wrongful when he did it. There must be, in order to justify punitive damages, some element of wantonness or bad motive, but if one intentionally does a wrongful act and knows at the time that it is wrongful he does it wantonly and with a bad motive.' " Beggs v. Universal C.I.T. Credit Corporation, Mo., 409 S.W.2d 719, 722 [2–4]; Warner v. Southwestern Bell Telephone Co., Mo., 428 S.W.2d 596, 603 [15–19]; DeSalme v. Union Electric Light & Power Co., 232 Mo.App. 245, 102 S.W.2d 779, 783 [7]. We have already found the evidence supports the trial court's award of actual damages resulting to plaintiffs from the executed conspiracy to intentionally and unjustifiably interfere with the contractual relation between plaintiffs and Murray.

Such an intentional interference is malicious in law and will support an award for punitive damages against the wrongdoers. 45 Am.Jur.2d, Interference, Sec. 61.

 In addition to the award of actual and punitive damages, the trial court also permanently enjoined the three defendants during the three year restrictive period from soliciting, contracting for or rendering the same or similar services to the thirty-six clients serviced by Murray during the last year of his employment with PMM. It is clear that where an action for damages will not afford an adequate legal remedy, equity will grant relief by injunction. Turner v. Stewart, 78 Mo. 480, 481; Sec. 526.030 V.A.M.S. Defendants contend, however, that the circumstances were not so exigent as to require this drastic equitable remedy. On the contrary, it is apparent that in no other way could plaintiffs have prevented the continuing violations of the covenant and the unlawful interference with their property rights. The injunctive remedy is peculiarly appropriate to prevent the violation of reasonable noncompetition covenants, particularly where, as here, the full damage to be suffered by the breach could be estimated only uncertainly. Renwood Food Products v. Schaefer, 223 S.W.2d l.c. 152 [7, 8]; Nokol Co. of Missouri v. Becker, 318 Mo. 292, 300 S. W. 1108, 1115 [3, 4]. See, also, cases listed in Missouri Digest, Injunction, ▮ 43 C.J.S. Injunctions §§ 85, 89 and 138. The conspiracy among the three defendants having been established, it can not matter that only Murray was an actual party to the covenant with PMM, all three will be enjoined from its violation. The rule that a stranger to a covenant may properly be enjoined from aiding and assisting the covenantor in violating his contract or receiving any benefit therefrom is supported by strong authority and is the law we follow in this state. Contour Chair Lounge Co. v. Aljean Furniture Mfg. Co., 403 S.W.2d l.c. 926; Nokol Co. of Missouri v. Becker, 300 S.W. l.c. 1113 [1]; LeMaine v. Seals, 47 Wash.2d 259, 287 P.2d 305, 314 [19]; 43

C.J.S. Injunctions § 84, p. 568. The permanent injunction against all three defendants restraining them from violating the Murray covenant for the full restrictive period properly issued.

We have examined defendants' other allegations of error and find them to be without merit.

Accordingly, the award of actual damages heretofore entered is modified so that plaintiffs have and recover from all three defendants the sum of $2,594.00 and, as modified, the judgment of the trial court is in all respects affirmed.

All concur.