SILVERS, ASHER, SHER & McLAR-
EN, M.D.s NEUROLOGY, P.C.,
Respondent,

v.

Sudhir BATCHU, M.D., Appellant.

No. WD 57066.

Missouri Court of Appeals,
Western District.

April 18, 2000.

Stephen F. Gaunt, Rolla, for appellant.

Susan Ford Robertson, Columbia, for respondents.

Before JOSEPH M. ELLIS, Presiding Judge, HAROLD L. LOWENSTEIN, Judge and THOMAS H. NEWTON, Judge.

JOSEPH M. ELLIS, Judge.

Sudhir Batchu, M.D., appeals from the judgment of the Circuit Court of Boone County in favor of Neurology, Inc.[1] on its claim of breach of contract for violation of the restrictive covenants of Dr. Batchu's employment contract.

On April 7, 1997, Sudhir Batchu, M.D., entered into a contract of employment with Neurology, Inc. (Neurology), a group medical practice consisting of four shareholder physicians, in Columbia, Missouri. During the six years prior to accepting employment with Neurology, Dr. Batchu had worked at several hospitals in the Columbia area in conjunction with his training. He had previously approached Neurology for employment on two separate occasions, but the group had no need for another physician at those times. In early 1997, two weeks prior to being contacted by Neurology, Batchu began a private practice in neurology in Columbia, treating approximately three to eight patients one day per week. At approximately the same time, Neurology approached Dr. Batchu and offered him a position with the practice. Batchu began working at Neurology on a full-time basis on July 1, 1997.

At the time Dr. Batchu entered into the employment agreement with Neurology, he also had an existing employment contract with Phelps County Regional Medical Center in Rolla, Missouri (Phelps). As a member of the hospital staff, Dr. Batchu ran the hospital's neurology clinic. He advised Neurology that his contract with Phelps could be terminated with one month's notice. However, Phelps refused to accept Dr. Batchu's resignation, and renegotiated his contract to run through August 15, 1997. During July and August of 1997, Dr. Batchu continued to fulfill his obligations at Phelps until a replacement could be found, which ultimately occurred in September, 1997. Throughout that time, he remained under contract with Phelps as a full-time staff neurologist, where he was required to be available at least 32 hours per week. Phelps ultimately determined that Dr. Batchu had performed 40% of his employment obligations during July and August, 1997, and he was paid 40% of his full-time salary. Dr. Batchu contested the Phelps' determination and contended that he provided more than

1. The full name of the corporation is Silvers, Asher, Sher & McLaren, M.D.s Neurology, P.C.

40% of his duties during that time. The neurology clinic at Phelps closed permanently in August, 1997.

Two weeks after signing the employment agreement with Neurology, and without the knowledge of any of its shareholders, Dr. Batchu became a shareholder in a corporation known as Mid–Missouri Health Systems (Mid–Missouri).[2] He testified that he was in negotiations with Mid–Missouri as far back as November, 1996. On behalf of Mid–Missouri, Dr. Batchu set up a neurology clinic in Rolla which saw patients from the former Phelps neurology clinic. The Mid–Missouri clinic began operation on August 15, 1997. Dr. Batchu testified that his intent was to have a physician partner work at the clinic on a full-time basis, while he helped out when needed, such as on call, weekends and consults. However, no other physician was in place until mid-September, 1997. In the meantime, Dr. Batchu continued to work, on a contractual basis and through Mid–Missouri, for Phelps as their only neurologist, beginning August 15, 1997. He testified that between August 15, 1997 and September 26, 1997, he treated between one hundred fifty and two hundred patients at the Rolla clinic. Beginning sometime in September, 1997, another neurologist, Dr. Wazzan, joined Mid–Missouri in the Rolla clinic to assist Dr. Batchu.

When he began working at Neurology on July 1, 1997, Dr. Batchu informed the shareholders that temporary obligations in Rolla would require him to fill in on an "emergency basis only" until a replacement physician could be found. Upon learning that Dr. Batchu was continuing to conduct a full-time practice in Rolla, the shareholders informed him that he was in violation of his contract of employment, which stated, in pertinent part:

3. SERVICES: Employee agrees to devote substantially his entire time and attention to the practice of medicine for the corporation. The expenditure of reasonable amounts of time for teaching, personal or outside business, charitable and professional activities shall not be deemed a breach of this Agreement provided such activities do not materially interfere with the services required to be rendered to Employee hereunder. The Employee shall not, without the express prior written consent of Employer, directly or indirectly during the term of this Agreement or for a period of twenty-four (24) months thereafter as more particularly detailed in Paragraph 13 of this Agreement, render services of a professional nature to or for any person or firm for compensation, or engage in any activity competitive with and adverse to Employer's business or practice, whether alone, as a partner or as an officer, director, employee or shareholder of any other corporation or as a trustee, fiduciary or other representative of any activity. The making of passive and personal investments and the conduct of private business affairs shall not be prohibited hereunder.

At the time the shareholders raised the issue of Dr. Batchu's activities in Rolla, he informed them that he would no longer be involved in practice there. However, Dr. Batchu continued seeing patients in Rolla, and discharged some of Neurology, Inc.'s hospitalized patients with instructions to follow up with him at the Mid–Missouri Rolla clinic. Moreover, Dr. Batchu continued to receive frequent calls from the Rolla clinic, and was repeatedly unavailable when he was supposed to be on call for Neurology. As a result, Dr. Batchu was terminated on September 26, 1997, and paid thirty days' salary.

Approximately one month after being terminated by Neurology, Dr. Batchu opened an office for the practice of neurology in Columbia, approximately two to three miles from Neurology where he saw

2. Dr. Batchu signed an agreement with Mid–Missouri Health Systems on April 18, 1997 as a shareholder and full-time physician employee, to commence August 15, 1997.

patients three days per week. On November 21, 1997, Neurology filed a petition in the Circuit Court of Boone County, seeking to permanently enjoin Dr. Batchu from practicing within a 75–mile radius of its office, pursuant to paragraph 13 of the employment contract, which states, *inter alia:*

13. *NON–COMPETITION AGREE-MENT:* Employee agrees that, should his/her employment with Employer be terminated for any reason whatsoever during the twenty-four (24) month period beginning with the date of the termination of Employee's employment, Employee will not, for himself or herself, on behalf of or for the benefit of any other person, firm, partnership or corporation perform any medical services or engage in the practice of neurology within seventy-five (75) miles of Employer's office located at 500 Keene Street, Columbia, Missouri 65201 on Employee's account, or otherwise solicit, service, refer to handle any medical business or engage in the practice of neurology for any patient of Employer who was a patient of Employer on the date of the termination of physician's Employment with Employer.

Following a hearing on March 18, 1998, the trial court issued a preliminary injunction on April 8, 1998 (effective April 14, 1998) enjoining Dr. Batchu from practicing medicine within a 75–mile radius of Neurology, and requiring Neurology to post a $10,000 bond.

On April 20, 1998, while the preliminary injunction was in place, Dr. Batchu sent a letter to all physicians listed in the Columbia telephone book, informing them that he was no longer seeing patients at Neurology, but that he would see them in other locations. He testified that the purpose of this letter was to obtain physician referrals.

The case was tried to the court on December 4, 1998, February 2, 1999, and February 16, 1999. In its judgment of March 5, 1999, the trial court ruled in favor of Neurology and ordered Dr. Batchu to pay damages in the amount of $40,000.[3] In addition, the trial court issued a permanent injunction in favor of Neurology, restraining Dr. Batchu from providing medical services in neurology within a 75–mile radius of Neurology until April 14, 2000, and from otherwise soliciting, servicing or referring any medical business or engaging in the practice of neurology for any patient who was a patient of Neurology at the time of Dr. Batchu's termination. The court also ruled in favor of Neurology on Batchu's counterclaims. Dr. Batchu appeals.

An action which seeks an injunction is an action in equity. *L.B. v. State Committee of Psychologists,* 912 S.W.2d 611, 616 (Mo.App. W.D.1995). The trial court's judgment will be upheld unless it is against the weight of the evidence, erroneously declares the law, or erroneously applies the law. *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976); *L.B.,* 912 S.W.2d at 616. We will only disturb the trial court's permanent injunction on the grounds that it is against the weight of the evidence with great caution, and the firm belief that it is wrong. *L.B.,* 912 S.W.2d at 616.

In his first point on appeal, Dr. Batchu argues that the trial court erroneously enforced the restrictive covenant because Neurology failed to show that the clause was reasonable as a matter of law. He contends that the provision is overbroad, creates an unreasonable absolute prohibition against treating even those patients who seek treatment from him, and does not protect a legitimate protectible interest of Neurology since his exposure to its patients was limited. Neurology maintains that the restriction is no greater than fairly required for the protection of its interests.

---

**3.** Neurology claimed damages in the amount of $24,240 in recruitment expenses to hire a replacement neurologist, and $57,785.15 in attorney's fees.

In its Findings of Fact, the trial court noted that while employed by Neurology, Dr. Batchu saw over 500 patients, the majority of which he had not seen before. Furthermore, the trial court determined that, although Neurology was unable to determine how many of those patients were the clinic's patients rather than Dr. Batchu's patients from his limited prior practice, at least one of the referred patients was seen for the first time at Neurology. In fact, Dr. Batchu testified that 80–90% of the patients he treated while at Neurology were first-time patients. He testified that he did indeed discharge some of the clinic's patients from area hospitals with instructions to follow up with him at the Rolla office rather than at Neurology because it was more convenient for the patient. Any revenues generated by Dr. Batchu's patient contacts in the Rolla clinic went directly to Dr. Batchu and were not shared with Neurology.

 The purpose of a non-compete agreement is to protect an employer from unfair competition by a former employee without imposing unreasonable restraint on the latter. *Continental Research Corp. v. Scholz,* 595 S.W.2d 396, 399 (Mo.App. E.D.1980). The rules applicable to enforcing such agreements emanate from that purpose. *AEE–EMF, Inc. v. Passmore,* 906 S.W.2d 714, 719–20 (Mo.App. W.D. 1995). "Temporary and spatially limited restraints on a former employee's ability to compete with his former employer articulated in a covenant not to compete are enforceable if reasonable under all attending circumstances and if enforcement serves the employer's legitimate interests." *Id.* at 719.

The Neurology/Batchu agreement was a conventional employment contract. Dr. Batchu was hired and paid to treat patients who sought Neurology's medical services. The restrictive covenant was a limitation on Dr. Batchu's practice of neu-

rological medicine within a 75–mile radius of Neurology's office, and prohibition from treating any individual who was a patient of Neurology at the time of his termination for a period of two years. The practice of neurology is a highly technical field, and the purpose of the Neurology/Batchu agreement was to protect Neurology's interest in its established patient base. Evidence was adduced at the hearing that Dr. Batchu discharged established Neurology patients to his private practice in Rolla, from which Neurology received no revenue. After his termination, he set up a neurology clinic within two to three miles of Neurology, and solicited referrals from area physicians. The restrictive covenant was designed to prohibit precisely such practices.

The Eastern District considered the technical and competitive nature of a particular field, along with sensitive information gained by the employee while working for the employer, when determining that a two- or three-year restriction and a 125– to 350–mile geographic radius is not unreasonable. *Mid–States Paint & Chemical Co. v. Herr,* 746 S.W.2d 613, 617 (Mo.App. E.D.1988) (territorial restriction of 125 to 350 miles held not unreasonable in highly technical field). Such criteria apply to the practice of medicine. *See also Champion Sports Center, Inc. v. Peters,* 763 S.W.2d 367, 370 (Mo.App. E.D.1989) (restrictive covenant and injunction which prohibited seller of business from competing with his former business in three-county area for eight years were reasonable as to length and geographic area). In this case, evidence was adduced at the hearing that Neurology patients are drawn from a five-state area.[4] In that context, a 75–mile radius restriction is not unreasonable. *See id.* at 617.

 Dr. Batchu argues that, given his short tenure with the clinic, Neurology did

4. Dr. Asher testified that Neurology sees patients from Missouri, Kansas, Illinois, Iowa, and Arkansas.

not have a protectible interest in its patient base. We disagree. "An employer has a protectible and proprietary right in his 'stock of customers' and their good will...." *Steamatic of Kansas City, Inc. v. Rhea,* 763 S.W.2d 190, 192 (Mo.App. W.D.1988). A "customer" is one who repeatedly has business dealings with a particular tradesman or business. *Empire Gas Corp. v. Graham,* 654 S.W.2d 329, 330–31 (Mo.App.1983). We may assume that if the proponent of the restrictive covenant has a trade following, that is, a group of customers who regularly patronize the business of the employer, there is a stock of customers and a protectible interest. *See id.*

■ An accepted method of limiting a post-employment restraint so as to be reasonable is to draft a covenant restricting the former employee from soliciting the former employer's clients. Harold William Hinderer III, *Covenants Not to Compete–Enforceability Under Missouri Law,* 41 Mo. L.REV. 37, 43 (1976). In *Mills v. Murray,* 472 S.W.2d 6 (Mo.App. W.D. 1971), this court found an employment contract which prohibited an employee from soliciting, contracting with, or serving those whom he had served during the last year of his employment for a period of three years to be reasonable. *Id.* at 11–12. *Mills* involved a business consulting firm and its employee consultants, serving medical and dental practitioners. *Id.* at 9. "[I]t was not unreasonable to anticipate that three years must pass before [the employee's] former clients are no longer subject to the influence of their former relationship." *Id.*

In the case at bar, the evidence adduced at the hearing revealed that Dr. Batchu had significant influence over the patients he saw while employed by Neurology. This is demonstrated by the fact that he was able to direct former Neurology patients to see him in his Rolla clinic for follow up, at which time they became exclusively patients of the Rolla clinic. Dr. Batchu cites no authority limiting the applicability of such an interest where the employee had access to sensitive information of a highly technical nature for a relatively short period of time. Therefore, Neurology's restraint of Dr. Batchu from treating individuals who were patients of the clinic at the time of his termination, for a period of two years, was not unreasonable. It protected a legitimate interest and concern of Neurology in retaining its patient base. *AEE–EMF, Inc.,* 906 S.W.2d at 719.

■ Dr. Batchu goes on to argue that restrictive covenants in general are contrary to public policy in Missouri, because they restrain commerce and limit an employee's freedom to pursue a trade. However, he does not raise this issue in his Point Relied On. Argument on issues not raised in the Point Relied On is inappropriate and will not be considered on appeal. *Rule 84.04(e); Lusher v. Gerald Harris Constr. Inc.,* 993 S.W.2d 537, 544 (Mo.App. W.D.1999). However, even if we were to consider this argument, we disagree with Dr. Batchu's blanket contention that restrictive covenants violate Missouri's public policy.

> Missouri courts recognize that public policy approves employment contracts containing restrictive covenants because the employer has a proprietary right in its stock of customers and their good will, and if the covenant is otherwise reasonable, the court will protect the asset against appropriation by an employee. In *Willman v. Beheler,* 499 S.W.2d 770, 777 (Mo.1973), our Supreme Court, in upholding a restrictive covenant among doctors, rejected the notion that public policy should prevent the enforcement of restrictive covenants. The court noted that "[t]here is a counterbalancing public policy which recognizes the interest of the public in protecting the freedom of persons to contract and in enforcing contractual rights and obligations."

*Schott v. Beussink,* 950 S.W.2d 621, 625 (Mo.App. E.D.1997). Point I is denied.

In his second point Dr. Batchu argues, in the alternative, that the permanent injunction should only run from the date of termination, not date of the preliminary injunction as determined by the trial court. He claims that by making the permanent injunction run two years from the date of the preliminary injunction, the period of restriction totaled two years and eight months, not two years as set forth in the contract.

In its Findings of Fact, the trial court noted that, within one month after his termination, Dr. Batchu had set up a clinic within two to three miles of Neurology and practiced medicine in violation of the covenant until the time of the preliminary injunction. Therefore, in order for Neurology to obtain the benefit of its contractual protection, it was necessary for the trial court to begin the term of restriction on the date of the preliminary injunction, or April 14, 1998. Enforcement of a non-compete clause from the date of a decree is not inequitable. *Furniture Mfg. Corp. v. Joseph*, 900 S.W.2d 642, 649 (Mo. App. W.D.1995). Point II is denied.

The judgment is affirmed.

All concur.