**KESSLER–HEASLEY ARTIFICIAL LIMB COMPANY, INC., d/b/a Ozark Prosthetics, Appellant,**

v.

**Michael KENNEY and Kenney Fabrication, Inc., Respondents.**

**No. 24201.**

Missouri Court of Appeals, Southern District, Division One.

Oct. 28, 2002.

Motion for Rehearing or Transfer Denied Nov. 19, 2002.

Application for Transfer Denied Dec. 24, 2002.

Bryan O. Wade, Husch & Eppenberger, LLC, Springfield, for Appellant.

Evelyn Gwin Mangan, Springfield, for Respondent.

ROBERT S. BARNEY, Judge.

Ozark Prosthetics ("Employer") appeals from the judgment of the Circuit Court of Christian County which refused to permanently enjoin Michael Kenney and Kenney Fabrication, Inc., (collectively, "Employee") from violating the terms of an employment agreement containing a non-competition clause ("non-compete" clause).[1]

In its first point, Employer maintains that it had a protectable interest in its stock of customers, namely, patients, doc-

---

1. No appeal is taken from the trial court's denial of Employee's counterclaim against Employer. Accordingly, it will not be reviewed.

tors and insurance companies. It argues that "a non-compete agreement reasonably limited in geographic scope and duration may be used to protect an employer's interest in 'customer contacts,'" and that the court erred in refusing to grant equitable relief prohibiting Employee from actively pursuing its customers, i.e., engaging in "customer contacts."

In its second point, Employer asserts court error on the basis that the non-compete clause was "a valid means ... to protect its patient files and fabrication procedures, which [Employer claims are] trade secrets," and that the court erred in refusing to enforce the agreement protecting its legitimate interest in these trade secrets.

"This Court will affirm an injunction unless it is unsupported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law." *Washington Cty. Mem'l Hosp. v. Sidebottom,* 7 S.W.3d 542, 544 (Mo.App.1999). "Because the circuit judge is in a superior position to assess credibility, deference is given to the circuit court's findings of fact, however, an independent evaluation of conclusions of law is made." *Id.* at 545.

The record shows that in 1992, Employee was hired as a "prosthetist" by Employer to work at its business located in Springfield, Missouri. As part of his day-to-day duties, Employee worked with individual patients, conducting initial consultations, fitting patients with prostheses (artificial limbs) and orthotics (braces), and conducting follow-up visits. Employee also handled patient referrals from insurance companies, insurance network providers and doctors related to the prosthetic and orthotic needs of referred patients.

During his tenure with Employer, Employee signed at least three employment agreements, each containing a restrictive covenant promising not to compete with Employer. In particular, the last employment agreement read, in pertinent part:

> During Employee's Term of Employment, and for a period commencing after the termination of the Term of Employment, and ending on the earlier of (i) five (5) years after the termination of the Term of Employment ... the Employee shall not, directly or indirectly, either as an individual for his own account ... enter into competition with the Company or engage in a similar or related business in competition with the Company within a fifty (50) mile radius of the corporate limits of Springfield, Missouri.

On January 18, 1999, Employee resigned. Approximately one month later, Employee formed Kenney Fabrication, Inc. Initially, Employee began fabricating prostheses in his garage for out-of-state retail prosthetic companies. As a wholesale fabricator, Employee did not see patients.

Employee later leased an office in Nixa, Missouri, which the record shows is within the restricted 50–mile radius of Springfield, Missouri. At the Nixa location, Employee fabricates artificial limbs and braces, and bills all of his new patients. Although Employee admitted that he began seeing patients at his Nixa office in May or June of 1999, Employee testified that he did not intend to see patients in Nixa, nor did he have a phone number for patients to call after he left Employer. Employee testified that Employer's former patients sought him out at his home.

Subsequently, Employee purchased a prosthetic company in Harrison, Arkansas, which the record reveals is outside of the restricted 50–mile radius as set out in the contract. Employee testified that he no longer sees patients at the Nixa location

and that the Nixa location is now strictly a wholesale fabrication center.[2] However, at trial, Employee admitted that he built prostheses in Nixa for his own patients, some of which were former patients of Employer.

The record shows that during the course of litigation the court entered a temporary injunction, prohibiting Employee from engaging in customer contacts with Employer's customers. Since the entry of that order certain of Employer's former patients sought follow-up care with Employee and drove to Employee's facility in Harrison, Arkansas. Employee testified that 9 of his 54 patients are former patients of Employer.

Even after Employee bought the prosthetic practice in Harrison, Arkansas, he has continued to do fabrication work in Nixa, both for the Harrison office and for the out-of-state retail prosthetic companies. In addition, Employee continued doing billings in Nixa, maintaining separate account records for the respective wholesale and retail portion of his business.

█ In the case at bar, the trial court did not make a direct finding regarding whether Employer had a protectable interest in its customer contacts. However, where, as here, the trial court does not make a finding of fact with regard to each issue raised by the parties, the appellate court will "consider all factual issues to have been found in accordance with the result reached and will sustain the judgment if the result is correct on any tenable basis." *Orthotic & Prosthetic Lab, Inc. v. Pott*, 851 S.W.2d 633, 639 (Mo.App.1993).

█ In our review of Employer's first point, premised on the court's refusal to impose a permanent injunction against Employee prohibiting Employee from engaging in customer contacts with its customers, we initially make the following observations regarding non-compete clauses or covenants not to compete.

Covenants by employees not to compete with their employers after termination of employment are no longer contrary to public policy in Missouri, yet they still are not favored in this state. Such covenants are carefully restricted because they deal with restraints on commerce and limit an employee's freedom to pursue his or her trade. The following general rule still attends: An employer cannot extract an enforceable restrictive covenant merely to protect himself from the competition of an employee. Accordingly, even when restrictive covenants on future employment are reasonable spatially and temporally, they are enforceable only if a legitimate protectable interest of the employer is served.

An assessment of the reasonableness of a covenant not to compete requires a thorough consideration of surrounding circumstances, which includes the subject matter of the contract, the purpose to be served, the situation of the parties, the extent of the restraint, and the specialization of the business. The issue of reasonableness is one of law according to the subject matter of the agreement and the existing circumstances.

*West Group Broad., Ltd. v. Bell,* 942 S.W.2d 934, 937 (Mo.App.1997) (citations omitted).

█ Missouri courts limit the granting of equitable protection to two narrowly defined and well-recognized interests, namely an employer's trade secrets and its stock in customers. *See Continental Research Corp. v. Scholz,* 595 S.W.2d 396, 400 (Mo.App.1980); *Easy Returns Midwest,*

---

**2.** Employee admitted at trial that he does not see patients at the Nixa office because of the

Temporary Restraining Order obtained by Employer on January 4, 2000.

*Inc. v. Schultz,* 964 S.W.2d 450, 453 (Mo. App.1998).

Stock in customers, also referred to as customer contacts, are a legitimate protectable interest. *See Deck and Decker Pers. Consultants, Ltd. v. Pigg,* 555 S.W.2d 705, 707 (Mo.App.1977). "Customer contacts derive from the influence an employee acquires over the employer's customers through personal contact." *Easy Returns,* 964 S.W.2d at 453. In the sales industry, the rationale for protecting "customer contacts" is that "a customer's goodwill toward a company is often attached to the employer's individual sales representative, and the employer's product or service becomes associated in the customer's mind with that representative." *Id.* As a result, the sales employee is "placed in a position to exert a special influence over the customer and entice that customer's business away from the employer." *Id.* Since "the employee's opportunity to influence customers justifies enforcement of the covenant not to compete ... the quality, frequency, and duration of an employee's exposure to an employer's customers are crucial in determining the covenant's reasonableness." *Sidebottom,* 7 S.W.3d at 545.

Employer argues that it established a protectable interest in its customer contacts with patients, doctors, and insurance companies. We will examine each group in turn.

### Existing and Future Patients/Customers Base

▇▇▇▇ Before an employer can claim to have a protectable interest in its customer contacts, the employer must have a stock of customers who regularly deal with the employer. *See Empire Gas Corp. v. Graham,* 654 S.W.2d 329, 330–31 (Mo.App. 1983). If the employer has a group of customers who regularly patronize the business of the employer, there is a stock of customers and a protectable interest. *Silvers, Asher, Sher & McLaren M.D.s Neurology, P.C. v. Batchu,* 16 S.W.3d 340, 345 (Mo.App.2000). A customer is one who repeatedly has business dealings with a particular tradesman or business. *Id.; Empire Gas,* 654 S.W.2d at 330.

Missouri courts have enforced physician and health care provider covenants not to compete similar to that of the instant case. *Armstrong v. Cape Girardeau Physician Associates,* 49 S.W.3d 821, 825 (Mo.App. 2001).

In *Willman v. Beheler,* for example, our supreme court, in upholding a restrictive covenant among physicians, rejected the notion that public policy should prevent the enforcement of restrictive covenants. 499 S.W.2d 770, 777 (Mo.1973); *Silvers,* 16 S.W.3d at 345. In *Sidebottom,* the appellate court affirmed a non-competition clause in an employment contract between a nurse practitioner and a hospital which provided that the nurse was not to engage in the practice of nursing for a period of one year within a 50 mile radius after she left her employment. *Sidebottom,* 7 S.W.3d at 543–44; 547.

Employer's interest lies in protecting its patient base, as income from patient billings constitutes its primary source of revenue. *Id.* at 545. "A patient base is a protectable interest under covenants not to compete." *Id.; see Ballesteros v. Johnson,* 812 S.W.2d 217, 222–23 (Mo.App.1991).

Here, Employer correctly asserts that it has a protectable interest in its customer contacts as to its established and future patients. Employer, through its employees, utilizing the prescription provided by the physician, measured each of its patients for the device to be fabricated and then constructed the device. After the

device was constructed, the patient received the prosthetic or orthotic, with adjustments and modifications being made thereafter as required. Employee's own testimony showed that the customers with whom he had substantial contact were continuous and repeat customers of Employer. As a prosthetist, Employee would initially see the individual in need of an orthotic or prosthetic device. Employee would then measure and fit the individual with the device, and provide follow-up care as the individual outgrew the device or simply needed adjustments. In the course of providing follow-up care, the record shows Employee saw some of Employer's patients over 20 times during his employment.

There is little doubt that Employee had significant influence over the customers he saw while working for Employer. *See Sidebottom,* 7 S.W.3d at 545. That influence is demonstrated by the fact that Employee was able to direct some of Employer's former patients to see him in his clinic in Harrison, Arkansas, at which time they became his exclusive patients. Much more than a typical employee or sales representative, Employee embodied the Employer in the eyes of the customers, just as a physician embodies his or her partnership more than does the office secretary. *See Superior Gearbox Co. v. Edwards,* 869 S.W.2d 239, 248 (Mo.App.1993).

Employee claims that he no longer sees Employer's former patients within a 50 mile radius of Springfield, Missouri, since those patients now drive to his office in Harrison, Arkansas. However, Employee violated the terms of the non-compete clause of his employment agreement because he had already affected Employer's customer base by treating Employer's for-

mer patients, the very thing Employer had sought to protect against with the non-compete clause. *See Sidebottom,* 7 S.W.3d at 546.

We conclude that Employer had a protectable interest in its existing and future prosthetic and orthotic customer contacts, a proper subject of protection, and that, therefore, Employee violated the covenant not to compete with regard to Employer's existing customer contacts. *See Batchu,* 16 S.W.3d at 345. The non-compete clause, as set out, should be enforced with regard to those existing and future patients of Employer.

### Patients Referred by Doctors, Insurance Companies and Insurance Network Providers.

█ The record shows that when Employee left Employer's business, Employee sought to be and, in fact, was listed with Primrose Healthcare Directory of Providers as an approved provider of prosthetic and orthotic services, showing a Nixa, Missouri, address. Employer maintains Employee's actions in so doing constituted a violation of the non-compete clause of their agreement. Employer argues that it has a legitimate protectable interest in its current and potential customers, including its referral sources, and is entitled to protect that interest through its non-compete clause which is reasonable in scope and duration. While we agree, we do so with certain limitations.

█ Here, prosthetic and orthotic devices were created *for referred patients. See Steamatic of Kansas City, Inc. v. Rhea,* 763 S.W.2d 190, 192–93 (Mo.App. 1988).[3] The record fails to show that there

---

**3.** In *Steamatic,* employer was engaged in a business providing general cleaning services for disaster victims, who were periodically

referred to employer by insurance adjusters. *Steamatic,* 763 S.W.2d 190, 191. The appellate court held that the employer's relation-

existed a particularly close relationship among Employer and Employee with the referral sources. Most certainly they were not confidential or privileged sources. In fact, at trial a witness from Primrose Healthcare testified that any prosthetist who met the company's criteria could be listed as a provider in the directory that was available both to doctors and patients. "To be protected, a customer list must be more than a listing of firms or individuals which could be compiled from directories or other generally available sources." *Empire Gas*, 654 S.W.2d at 331. "Only when it represents a selective accumulation of information based on past selling experience, or when considerable time and effort have gone into compiling it, will appropriation and use in competition by the former employee be enjoined." *Id.*

It is our view that the non-compete clause of the agreement applied to Employer's existing and future customers/patient base, within a 50 mile radius of Springfield, Missouri, for a period of five years, as set out, including those patients referred to Employee by physicians, insurance companies and medical network providers. However, it is also our view that the non-compete clause does not prevent Employee from being listed by medical network providers or insurance companies, or from seeing otherwise referred patients by these entities and physicians, as a provider of prosthetic and orthotic services outside the 50 mile radius of Springfield, Missouri. *See id.* Accordingly, Employer's first point is affirmed in part and denied in part.

### Trade Secrets

In its final point, Employer asserts trial court error in failing to enforce the employment agreement as it related to protecting its patient files and, more particularly, fabrication procedures, which Employer claims are trade secrets.

We have already determined, *inter alia*, that Employer has a protectable interest in its existing patient files. A trade secret may also include a list of customers. *National Rejectors, Inc. v. Trieman*, 409 S.W.2d 1, 18–19 (Mo. banc 1966).

While Employer is correct in its assertion that a non-compete agreement is a valid means for an employer to protect its legitimate interest in trade secrets, the trial court found there was no evidence presented showing that Employer possessed any special procedure or knowledge that was any different than any other certified prosthetic service entity, nor that there were any "trade secrets" possessed by Employer to which Employee had access. With regard to this latter sub-point, we agree with the trial court.

In *Trieman*, the Supreme Court of Missouri adopted a general definition of "trade secret." A trade secret can be "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Id.*

"The subject matter of a trade secret must be secret." *AEE–EMF, Inc. v. Passmore*, 906 S.W.2d 714, 722 (Mo.App. 1995) (emphasis omitted). "Matters of

ship with the insurance adjusters, which was nurtured to procure favorable recommendations, could not amount to a protectable customer interest because "[t]he insurance companies were not [employer's] customers and therefore [employer] had no protectable inter-

est in the good will of the adjusters." *Id.* at 193. Furthermore, the court observed that "[a]lthough insurance may be involved, it is the owner of the property [requiring cleaning and restorative services] who decide[d] whether to employ [employer]." *Id.* at 191.

public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret." *Id.; Steamatic,* 763 S.W.2d at 194.

Here, the record reveals that the techniques utilized by Employer appear to be such as would be utilized in any prosthetic/orthotic business. The record supports the trial court's finding that there is a standardized system regarding the fabrication of prosthetic appliances that is currently in use by the prosthetic industry. The record also shows that the numbering system used by Employer is universally accepted and used by Medicare, Medicaid, and the health insurance companies. "Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret." *AEE–EMF,* 906 S.W.2d at 722.

Save for Employer's existing patient/customer lists, the trial court's finding that Employer had no protectable interest in trade secrets, is supported by the evidence and is not against the weight of the evidence. *Id.*

This Court will set aside a judgment as against the weight of the evidence only "with a firm belief that the ... judgment is wrong." *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). Point two is denied, except that Employer's existing patient/customer lists may be considered to be a trade secret and Employee is enjoined from obtaining or servicing those patients of Employer set out in such list. *Trieman,* 409 S.W.2d at 18–19.

Consistent with the opinion of this Court, the judgment of the trial court is affirmed in part and reversed in part. In consonance with the opinion of this Court, the cause is remanded with directions for the trial court to enter injunctive relief in favor of Appellant. The trial court is authorized to take additional evidence on the issue of possible equitable relief and dam-

ages and on the issue as to what date the five year non-compete provision came into effect.

MONTGOMERY, P.J., and GARRISON, J., concur.