**VICTORIA'S SECRET STORES, INC.,**

and

**Mark J. Weikel, Respondents,**

v.

**The MAY DEPARTMENT STORES COMPANY, Appellant.**

**No. ED 83916.**

Missouri Court of Appeals,
Eastern District,
Division Four.

Dec. 21, 2004.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 3, 2005.

257

Thomas C. Walsh (Bryan Cave), Mark S. Deiermann, St. Louis, MO, for appellant.

William M. Corrigan, Jr., Ann E. Buckley, Armstrong Teasdale LLP, St. Louis, MO, Michael G. Long, Kimberly Weber Herlihy, Vorys, Sater, Seymour and Pease

LLP, Columbus, OH, for Victoria's Secret Stores, Inc.

John Gianoulakis, Kohn, Shands, Elbert, Gianoulakis & Giljum, LLP, St. Louis, MO, Anthony J. Ashley, Vedder, Price, Kaufman & Kammholz, Chicago, IL, for Mark J. Weikel.

LAWRENCE G. CRAHAN, Judge.

The May Department Stores Company ("May") appeals a judgment declaring that its former employee, Mark J. Weikel ("Weikel"), would not be in violation of the non-competition provisions of his employment contract by accepting a position with Victoria's Secret Stores, Inc. ("VSS"). We affirm.

Weikel was employed by May as Chairman of its Foley's Department Store ("Foley's") division. In 2000, Weikel and May entered into an Employment Agreement ("Agreement") whereby Weikel would render personal services to Foley's from May 15, 2000 until April 30, 2003 (later extended to April 30, 2005).

In the Agreement, Weikel agreed to the following provision:

At all times while you are employed by May and for two years after your employment terminates, you will not directly or indirectly:

(i) own, manage, operate, finance, join, control, advise, consult, render services to, have an interest or future interest in or participate in the ownership, management, operation, financing or control of, or be employed by or connected in any manner with any Competing Business . . .

The section of the agreement defining "Competing Business" provides:

"Competing Business" includes, but is not limited to, (i) any (x) retail department store, specialty store or other retail business that sells goods or merchandise of the types sold in May's (or its subsidiaries' or divisions') stores at retail to consumers or (y) any group of such stores or businesses or any other business that (A) competes (for customers, suppliers, employees or any other resource) with May or a May subsidiary, division or store; (B) is located in the United States . . .; and (C) had annual gross sales volume or revenues . . . in the prior fiscal year of more than $25 million . . .; or

. . . .

(iii) any business in the United States or another country where May or a May subsidiary or division operates a store or stores in which your duties and functions would be substantially similar to your duties and functions under this Agreement and that is in material competition with May or a May subsidiary or division.

The Agreement further provided that either party could seek a judicial determination of its rights under the Agreement and that the parties would abide by their obligations under the Agreement until the court entered a final judgment.

In the spring of 2003, VSS made Weikel an offer to become its Chief Operating Officer. Weikel considered this a once-in-a-lifetime opportunity. After negotiations between his counsel and VSS, Weikel entered into an indemnification agreement with VSS, but he did not accept the offer of employment or sign an employment agreement. The following business day, Weikel met with his boss, Drew Pickman ("Pickman"), to tell him of the offer from VSS and to seek May's agreement that his acceptance of VSS's offer would not violate the terms of the restrictive covenant or any other contractual obligations to May because VSS is not a competitor of May. Weikel requested an immediate response because both he and VSS were anxious to

begin their relationship. Weikel pledged to continue to faithfully perform all of his duties under the Agreement and offered to assist May with the transition to a new Chairman of Foley's.

Pickman told Weikel that he wanted him to stay and that he would work with the CEO of May to persuade him to stay. Pickman told Weikel that he believed VSS was a competitor of May and asked for more time to respond. Weikel told Pickman he needed an answer that day.

Because May would not agree that VSS and May are not competitors, Weikel and VSS filed the underlying declaratory judgment action seeking a declaration that Weikel's employment by VSS would not violate his Agreement with May. On June 9, 2003, upon learning of the filing of the declaratory judgment action, May terminated Weikel from active employment but continued to pay his salary. Weikel did not begin working for VSS, and he remained inactive pending the trial court's judgment.

On November 20, 2003, after each party submitted extensive testimony and numerous exhibits, the trial court entered its judgment, including findings of fact and conclusions of law. The trial court found that VSS is an independent subsidiary of Limited Brands, Inc., and it specializes in the sale of women's intimate apparel. VSS is a vertically-integrated specialty retailer that sells only a single brand, Victoria's Secret. It designs its own lingerie and controls its manufacture and distribution through its own channels. VSS targets younger women, specifically in their mid-twenties, who are willing to pay higher prices for the Victoria's Secret premium brand. VSS markets sex appeal for the fashion conscious. VSS has annual sales of approximately $2 billion per year.

May and its divisions, including Foley's, are traditional department stores that sell a broad array of products, consisting of hundreds of merchandise categories and thousands of brands. Intimate apparel constitutes approximately 3% of May's overall sales. May's core customers are women between the ages of 40 and 50 years old. May is considered a branded business in that it sells products manufactured by others as opposed to a private label business. May's bi-annual Market Share report, which breaks down its market share and apparel store competitors, does not mention VSS.

VSS customers are "item specific" and loyal to the Victoria Secret brand. VSS has developed a marketing strategy that is brand-driven as opposed to price-driven. That strategy is separate and distinct from that used by May or other broad-line retailers. VSS promotes its designer image. In contrast, May's business focuses on price advantage and does not trade on brand loyalty.

The trial court further found that VSS wanted to hire Weikel solely for his personal skills and not for any information or knowledge he has about May. It is not interested in information he has about how May conducts its business because its business focus, strategy and marketing techniques are not at all similar to May's. VSS does not competitively shop May or study anything May does in terms of sales, products or operations. VSS finds such information to be counterproductive because May is a traditional or horizontal marketer whose retailing approach is markedly different from VSS.

The trial court found no evidence that Weikel had attempted to solicit or contact any other employees or executives of May. There was no evidence of specific customer lists or contacts Weikel would be able to use if employed by VSS and no evidence Weikel had divulged any confidential or

proprietary information to VSS. Weikel has signed a non-disclosure agreement with VSS prohibiting solicitation of May employees or disclosure of any of May's confidential information.

The trial court found that the restrictive covenant in Weikel's Agreement with May was only triggered if he went to work for a competing business. It further found that May and VSS do not compete in any material or meaningful way. The targeted customer profiles of the two companies are completely different. They do not compete for suppliers, vendors or other resources. VSS has its own designs manufactured overseas for exclusive sale in its own stores. Intimate apparel is the primary product of VSS but comprises only about 3% of May's overall sales.

May and VSS use completely different marketing strategies. VSS has successfully built its company using a vertically integrated market strategy that is totally different from that used by May. Any confidential information possessed by Weikel is not sought by VSS and would not give VSS a competitive edge over May. The non-competition provision of the Agreement was found not to be per se unreasonable or unenforceable, merely inapplicable under the facts and the law in this case because no material competition exists between VSS and May. Although the trial court found no evidence Weikel had solicited May employees or misused confidential or trade secret business information from May, the provision barring such activity was found to be enforceable for one year pursuant to section 431.202 RSMo Supp.2001. Based on these findings, the trial court entered judgment in favor of Weikel and VSS on their claim for declaratory relief and against May on its counterclaim for tortious interference and civil conspiracy. May appeals.

■■■ The standard of review is the same for the three points May brings on appeal. The judgment of the trial court will be sustained unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). The primary rule in the interpretation of a contract is to ascertain the intent of the parties and to give effect to those intentions. *Kling v. Taylor–Morley, Inc.*, 929 S.W.2d 816, 819 (Mo.App.1996).

■■■ By definition, covenants by employees not to compete with their employers after termination of their employment restrain trade in a free market. *Grebing v. First Nat'l Bank of Cape Girardeau*, 613 S.W.2d 872, 874 (Mo.App.1981). Covenants not to compete are presumptively void and are enforceable only to the extent they are demonstratively reasonable. *Armstrong v. Cape Girardeau Physician Assocs.*, 49 S.W.3d 821, 825 (Mo.App.2001). The determination of reasonableness depends upon the competing needs of the parties as well as the needs of the public. *Grebing*, 613 S.W.2d at 874. These needs are: (1) the employer's need to protect legitimate business interests, such as trade secrets and customer lists; (2) the employee's need to make a living; and (3) the public's need to secure the employee's presence in the labor pool. *Id.* A restrictive covenant in an employment agreement is only valid and enforceable if it is necessary to protect trade secrets and customer contacts, and if it is reasonable as to time and place. *Schmersahl, Treloar & Co., P.C. v. McHugh*, 28 S.W.3d 345, 349 (Mo.App.2000). The burden of demonstrating the covenant's validity is on the party seeking to enforce it. *Armstrong*, 49 S.W.3d at 825.

■ In its first point, May urges that the trial court's finding that VSS does not compete with May is against the weight of the evidence and erroneously declares and applies the law in that: (1) the covenant defines competition so as to include VSS and its affiliated companies; (2) the evidence overwhelmingly established that both companies sell hundreds of millions of dollars worth of intimate apparel in many of the same markets at comparable price points; (3) there is a substantial amount of cross-shopping by customers and the parties for employees as well as customers; and (4) VSS has repeatedly identified department stores as significant competitors and May's intimate apparel department considers VSS as among its principal competitors. We will briefly examine these contentions in turn.

May's first contention misstates the findings of the trial court. The trial court did not find that VSS and May are not competitors, it found that there was no meaningful or material competition between May and VSS. This finding suggests that the trial court was applying definition (iii) of the term "Competing Business" set forth above. That definition defines a competing business as one located in the same country as a May store or stores in which Weikel's duties would be substantially similar to his duties at May and that is in "material competition" with May or a May subsidiary or division. The term "material competition" is not further defined.

There is substantial evidence that VSS was not a business that was in "material competition" within the intent of the parties. The trial court specifically found that May's bi-annual Market Share report, which breaks down its market share and apparel store competitors, does not mention VSS. Clearly, not all businesses that offer the "same" products, broadly defined,

are necessarily in "material competition." Ritz–Carlton and Motel 6 both offer lodging, but few would characterize the competition between them as "material." Mortons of Chicago and McDonalds both offer food, but it is unlikely that either firm would view the other as a "material" competitor. More importantly, it is highly unlikely that an executive moving from any of these firms to the "competitor" would give the new employer an unfair competitive advantage, which is one of the key stated purposes of the agreement at issue in this case. The trial court specifically found that any confidential information possessed by Weikel would not give VSS a competitive advantage over May. This finding is supported by substantial evidence.

May would apply definition (i) of the term "Competing Business," which includes any retailer of goods or merchandise of the type sold by May with a sales volume of $2 million. The difficulty with this contention is that definition (iii) specifically defines the term as applied to employment in a similar capacity, which is the situation presented in this case. Moreover, if literally applied, definition (i) would preclude employment by virtually every non-automotive or hardware retailer in the United States. On this record, such a broad prescription would appear to be far broader than necessary to protect May from any unfair competitive advantage. We find no error in the trial court's application of the more specific definition found in paragraph (iii).

It is certainly true, as May urges, that the record establishes that both May and VSS sell hundreds of millions of dollars worth of intimate apparel. There was substantial evidence, however, that they are selling them to essentially different groups of consumers. May's evidence with respect to the amount of cross-shopping did

not establish the percentage of customers who actually made purchases of intimate apparel at both stores and was apparently found unpersuasive by the trial court.

May also draws our attention to impeachment evidence it offered to establish that, while not necessarily mentioning May or its divisions specifically, VSS has in various court proceedings, internal documents, and public filings identified department stores as competitors for the sale of intimate apparel. The trial court, however, apparently found VSS's witnesses and their explanations of these documents more credible. More importantly, however, the meaning of "material competition" in the Agreement must be based on what the parties to the agreement intended, not how VSS views the market.

■■■ In sum, the trial court found that VSS and May are not in material competition for the sale of intimate apparel. This determination was made by the trial court after examining evidence presented by both parties and determining the credibility of witnesses before the court. The credibility of witnesses and the weight to be given to their testimony is a matter for the trial court. *In re Marriage of Crow and Gilmore,* 103 S.W.3d 778, 783 (Mo. banc 2003). Although May points to evidence presented at trial in support of its contentions, the trial court may have disregarded all of the evidence favorable to May. The trial court is free to believe none, part or all of the testimony of witnesses. *Herbert v. Harl,* 757 S.W.2d 585, 587 (Mo. banc 1988). We hold that the trial court's findings are supported by substantial evidence, are not against the weight of the evidence and do not erroneously declare or apply the law. Point denied.

■■■ In its second point, May argues the trial court erred in refusing to enforce Weikel's covenant not to compete because the overwhelming evidence established that Weikel had knowledge of and access to numerous types of confidential information concerning May's marketing, pricing, personnel, vendor margins, cost-control efforts, staffing, inventory, expansion plans, and other data that are proprietary to May and would be useful to VSS and its affiliated companies.

■■■ Covenants not to compete are enforceable only to protect against unfair competitive use of either customer contacts or trade secrets. *Armstrong,* 49 S.W.3d at 825. The Missouri Uniform Trade Secrets Act defines a trade secret as "a formula, pattern, compilation, program, device, method, technique or process" that derives value from not being known and not being readily ascertainable by proper means by others who can obtain economic value from its use and is "the subject of [reasonable] efforts . . . to maintain its secrecy." Section 417.453 RSMo 2000. The protection does not extend to knowledge that is the natural product of the employment or known throughout the industry, but only to trade secrets or influences over customers. *See Renwood Food Products v. Schaefer,* 240 Mo.App. 939, 223 S.W.2d 144, 151–52 (1949).

There is no dispute that Weikel did not have customer contacts which could conceivably give VSS an unfair competitive advantage over May. May argues that the trial court "implicitly" found that Weikel possessed trade secrets in light of its finding that Weikel's non-disclosure agreement could be enforced if he misused confidential or trade secret business information. We do not view this observation as a finding that Weikel has any information which constitutes a May company trade secret. The trial court expressly found that any confidential information possessed by

Weikel would not give VSS a competitive advantage over May.

May produced three witnesses on the subject of confidential information. Kay Piper ("Piper"), May's Vice–President of the intimate apparel and hosiery department, testified with respect to intimate apparel confidential information. She identified four May company reports she believed might be valuable to a competitor. She had never heard Weikel's name until the lawsuit was initiated and had no idea whether he had seen any of the reports. Weikel testified that he spent less than 3% of his time on intimate apparel matters at Foley's, concentrating instead on operational matters involving areas such as furniture, mattresses, cosmetics and shoes. He had never reviewed any strategic initiatives regarding intimate apparel at Foley's or May.

Kenneth Wilkerson ("Wilkerson"), May's designated corporate representative regarding confidential information other than intimate apparel, identified several categories of confidential information to which a Chairman at May would have had access. These included two sales reports, the departmental operating report, May's staffing system, May's customer service program and human resource information. Wilkerson had no knowledge that Weikel had any of May's confidential information in his possession and Weikel testified that he did not. Weikel has had no ability to access such information since June 2003.

There was evidence that the confidential information to which Weikel would have had access was not readily susceptible to memorization and had a limited useful life. Wilkerson conceded that he could not recite the actual sales numbers and figures in the sales report without having the document in front of him. The intimate apparel steering committee meets six times per year to generate a business plan setting out the strategic direction for May's sale of intimate apparel. Those plans are updated and changed every couple of months. The confidential reports identified by Piper are generated weekly or monthly. May's seasonal plans and forecasts, discussed at the twice-annual President's Counsel and Chairman's roundtable meetings, cover a six-month period of time. Sales and other reports are generated weekly or monthly. May's merchandising plans are generally for a six-month period, but they are constantly reviewed and updated. Based on this evidence, the trial court could reasonably have found that while the actual reports themselves would be potentially valuable to a competitor when issued, the useful life of the reports is relatively short. The fact that Piper, who is in charge of May's intimate apparel business, has a six-month non-competition agreement supports this inference. The trial court's finding that any confidential May business information known to Weikel would not give VSS a competitive advantage over May is supported by substantial evidence. Point denied.

█ May's third proffered witness on the subject of confidential information was John Dunham ("Dunham"). The trial court initially precluded Dunham from testifying as to matters designated by May and about which May had previously called Wilkerson to testify. The trial court did, however, allow May to proffer Dunham's testimony and to file a post-trial memorandum as to the propriety of allowing him to testify on the same subject as the designated corporate representative. It its third point, May urges that the trial court erred in excluding Dunham's testimony although it did listen to Dunham testify during the proffer and never explicitly ruled on May's post-trial memorandum. We find that Dunham's testimony was cumulative and repetitive of Wilkerson's testimo-

ny and, assuming it was excluded, May was not prejudiced thereby. *Steffen v. Southwestern Bell Telephone Co.,* 331 Mo. 574, 56 S.W.2d 47, 48 (1932); *Keller v. Int'l Harvester Corp.,* 648 S.W.2d 584, 588–89 (Mo.App.1983). Point denied.

The judgment is affirmed.

LAWRENCE E. MOONEY, P.J., and MARY K. HOFF, J., concur.