**Russel S. BROWN,**
**Plaintiff/Respondent,**

v.

**ROLLET BROS. TRUCKING COMPANY, INC., R.B.T., Inc., E & R Lime Co., and Rollet Bros. Logistics, Inc., Defendants/Appellants.**

**No. ED 91533.**

Missouri Court of Appeals,
Eastern District,
Division Four.

June 16, 2009.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 3, 2009.

Application for Transfer Denied
Oct. 6, 2009.

John J. Gazzoli, Jr., Schmiedeskamp, Robertson, Neu & Mitchell, LLP, St. Louis, MO, for appellant.

Thomas L. Hoeh, Perryville, MO, for respondent.

KATHIANNE KNAUP CRANE, Presiding Judge.

Defendants appeal from a declaratory judgment in favor of their former employee declaring that defendants were not entitled to enforce the parties' Non–Compete and Confidentiality Agreement (the Agreement) against plaintiff. On appeal, defendants contend that the trial court erred in concluding the Agreement was unenforceable against plaintiff because they had a protectable interest in their customer contacts and confidential information. We modify the judgment by eliminating cer-

tain findings of fact and conclusions of law as surplusage. We affirm as modified.

Defendants, Rollet Bros. Trucking Company, Inc., R.B.T., Inc., E & R Lime Co., and Rollet Bros. Logistics, Inc., consist of four affiliate companies generally involved in the commodities market. One of the defendants, Rollet Bros. Logistics, Inc., is a freight broker that arranges for the hauling of commodities for customers from one point to another. Plaintiff, Russel S. Brown, began employment as a dispatcher for one or more of the defendants in January 1999.[1] As a dispatcher, plaintiff was responsible for finding loads for trucks to haul by contacting established and prospective customers on a daily basis. He was also responsible for finding trucks that were available to haul a customer's load.

On May 2, 2002, plaintiff and representatives of each defendant signed the Agreement as a condition of continued employment. The Agreement contained the following covenant not to compete:

> 2. [Plaintiff] agrees that, for [three years after the date of cessation of employment with defendants], [plaintiff] will not directly or indirectly or in concert with any person or persons, firm, corporation, or other entity, or in any manner, solicit, divert or handle or attempt to solicit, divert or handle any of the past or present customers of [defendants], regardless of where such customers might be located with respect to any business that consists of, pertains to, or relates in any way to the business conducted by [defendants].

The Agreement also contained a confidentiality clause.

In August 2005, plaintiff submitted his resignation to defendants. In September 2005, he began working as a dispatcher for Elizabeth Commodities & Logistics, Inc. (ECO Logistics), a newly-formed freight brokerage company similar to Rollet Bros. Logistics, Inc. The owners of ECO Logistics also owned Elizabeth Transportation, LLC, a trucking company. In November 2005, an attorney for one of the defendants sent a letter to plaintiff and to Elizabeth Transportation, claiming that plaintiff had violated the Agreement and threatening legal action if the violation continued. To avoid the risk of a lawsuit, ECO Logistics terminated plaintiff.

Plaintiff subsequently filed a lawsuit against defendants. In the first count he requested a declaratory judgment that the Agreement was not enforceable against him, or if enforceable, that he had not violated it. In the second count he sought damages for defendants' alleged tortious interference with plaintiff's employment contract with ECO Logistics. Defendants filed a counterclaim seeking damages for breach of the Agreement and for tortious interference with a different contract and with a business expectancy defendants had with Elizabeth Transportation.

The case proceeded to a bench trial that was limited to plaintiff's declaratory judgment count. Defendants made a pretrial request for findings of fact and conclusions of law. The trial court entered judgment in plaintiff's favor. As relevant to this appeal, it included the following in its findings of fact:

> 8. Throughout Plaintiff's employment with Defendants, Plaintiff acted as a dispatcher. In this capacity, he had regular contact with Defendants' customers and prospective customers as part of his job. He regularly spoke with prospective customers and prospective

---

1. Plaintiff requested that the trial court not resolve the question of which of the defendants was plaintiff's employer, and the trial court found that it was unclear who the employer was.

customers as part of his job. He regularly spoke with prospective customers about hauling their commodities.

9. Defendants did not really have legitimate and protectable interests in its customer list, as the customer list basically served as a "phone book" for the business.

10. Throughout Plaintiff's employment with Defendants, Defendants set all rates quoted to customers or potential customers.

11. Plaintiff had no authority to set rates quoted to customers or potential customers.

12. Plaintiff had no authority to deviate from the rates established by Defendants.

13. Plaintiff was never involved in setting rates quoted to customers or potential customers.

14. Defendants provided Plaintiff with a list of rates to quote to customers or potential customers.

15. Whenever a customer or potential customer asked Plaintiff to deviate from the rates set by Defendants, Plaintiff was required by Defendants to obtain permission from Defendants to deviate from said rates.

16. The rates charged by one or more Defendants were general enough and available to anyone that might bother to look for it. There was no secret formula involved here which might have a protectable interest.

17. Defendants did not really have legitimate interests in the confidentiality of its price, rates and surcharges and other business planning information, as the information contained was general enough and available to anyone that might bother to look for it. There was no secret formula involved here which might have a protectable interest.

The trial court also entered the following as its conclusions of law:

18. Plaintiff's employment with one or more Defendants is not the proper subject of a valid and enforceable noncompete agreement.

19. The Non–Compete and Confidentiality Agreement (Plaintiff's Exhibit 1) is void ab initio as to Plaintiff and all Defendants.

20. The Non–Compete and Confidentiality Agreement (Plaintiff's Exhibit 1) is not enforceable by any Defendant against Plaintiff.

It denominated its ruling a final judgment under Rule 74.01(b) and found there was no just reason for delay of the appeal.

## DISCUSSION

### Standard of Review

We will sustain the judgment of the trial court in a court-tried case unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Board Educ. St. Louis v. Missouri Bd. Educ.*, 271 S.W.3d 1, 7 (Mo. banc 2008); *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. 1976). If the facts of a case are contested, we defer to the trial court's factual determinations. *Board Educ. St. Louis*, 271 S.W.3d at 7. We are not bound by the trial court's legal conclusions. *Mullenix–St. Charles Props. v. St. Charles*, 983 S.W.2d 550, 555 (Mo.App.1998).

When a trial court does not make a finding of fact on each issue raised by the parties, we will " 'consider all factual issues to have been found in accordance with the result reached and will sustain the judgment if the result is correct on any tenable basis.' " *Kessler–Heasley Artificial Limb Co., Inc. v. Kenney*, 90 S.W.3d 181, 185 (Mo.App.2002) (quoting *Orthotic & Prosthetic Lab, Inc. v. Pott*, 851 S.W.2d

633, 639 (Mo.App.1993)). A trial court's failure to make a requested finding of fact requires reversal only if the failure materially interferes with appellate review. *Ratteree v. Will,* 258 S.W.3d 864, 872 (Mo.App. 2008). If the record is sufficient to support the judgment, we will affirm. *Id.*

### Final Judgment

▪ Before this appeal was submitted, we entered a show cause order requesting that the parties address whether the trial court properly certified this judgment as final under Rule 74.01(b). In their responses, neither party disputed that the trial court properly certified this case for appeal under Rule 74.01(b). However, when a trial court has disposed of fewer than all of a party's claims, we have a duty to determine, *sua sponte,* whether the trial court's judgment is an appealable final order, even if the trial court denominated its ruling a final judgment and found no just reason for delay of an appeal under Rule 74.01(b). *Gibson v. Brewer,* 952 S.W.2d 239, 244 (Mo. banc 1997). The required judicial unit for an appeal must consist of a judgment on a claim that is different, separate, and distinct from the transactions or occurrences that underlie unresolved claims and issues in the trial court. *Id.* We review the trial court's determination for abuse of discretion. *ARC Industries, Inc. v. Siegel–Robert, Inc.,* 157 S.W.3d 344, 346 (Mo.App.2005).

▪ In this case, the judgment resolved plaintiff's declaratory judgment claim by declaring the Agreement to be unenforceable. It thereby necessarily disposed of defendants' counterclaim for breach of the Agreement. *See Hall v. Hall,* 53 S.W.3d 214, 220 n. 2 (Mo.App.2001); *State ex rel. Nixon v. Hoester,* 930 S.W.2d 52, 53 (Mo. App.1996). These two claims are separate and distinct from the remaining tortious interference claims asserted by the parties against each other with respect to two other contracts. The trial court did not abuse its discretion in denominating its judgment a final judgment under Rule 74.01(b).

### Analysis

▪ "Generally, because covenants not to compete are considered to be restraints on trade, they are presumptively void and are enforceable only to the extent that they are demonstratively reasonable." *Easy Returns Midwest, Inc. v. Schultz,* 964 S.W.2d 450, 453 (Mo.App.1998). "The issue of reasonableness is one of law according to the subject matter of the agreement and the existing circumstances." *West Group Broadcasting, Ltd. v. Bell,* 942 S.W.2d 934, 937 (Mo.App.1997). *See also Kessler–Heasley,* 90 S.W.3d at 186. "In practical terms, a non-compete agreement is reasonable if it is no more restrictive than is necessary to protect the legitimate interests of the employer." *Healthcare Services v. Copeland,* 198 S.W.3d 604, 610 (Mo. banc 2006). To enforce an agreement an employer must show that the agreement is reasonable in scope, both as to place and time. *Id.; Easy Returns,* 964 S.W.2d at 453. In addition, non-compete restrictions are enforceable only to protect certain narrowly-defined and well-recognized interests, specifically, customer contacts and trade secrets. *Healthcare Services,* 198 S.W.3d at 610; *Easy Returns,* 964 S.W.2d at 453. *See also Osage Glass, Inc. v. Donovan,* 693 S.W.2d 71, 73–75 (Mo. banc 1985); *Schmersahl, Treloar & Co., P.C. v. McHugh,* 28 S.W.3d 345, 349 (Mo.App.2000). In this regard, covenants not to compete "are enforceable only to protect against unfair competitive use of either customer contacts or trade secrets." *Victoria's Secret v. May Dept. Stores,* 157 S.W.3d 256, 262 (Mo.App.2004).

The trial court found that the geographic and temporal terms of the Agreement were reasonable. The issue on appeal is whether the restrictions were necessary to protect against the unfair competitive use of defendants' customer contacts or trade secrets.

### A. Customer Contacts

▮▮▮▮ Defendants first argue that the Agreement is enforceable to protect their customer contacts and goodwill because plaintiff had substantial customer contacts while employed by defendants. "Customer contacts" is defined as the influence an employee acquires over his or her employer's customers through personal contact. *Healthcare Services*, 198 S.W.3d at 611. "Customer contacts are a protectable commodity because goodwill develops between the customers and the employer through its employees whose job it is to meet and converse with the customer while representing the employer." *Systematic Business Services v. Bratten*, 162 S.W.3d 41, 51 (Mo.App.2005). "The rationale for protecting 'customer contacts' is that in the sales industry, a customer's goodwill toward a company is often attached to the employer's individual sales representative, and the employer's product or service becomes associated in the customer's mind with that representative." *Easy Returns*, 964 S.W.2d at 453 (citing *Continental Research Corp. v. Scholz*, 595 S.W.2d 396, 401 (Mo.App.1980)). "The sales employee is thus placed in a position to exert a special influence over the customer and entice that customer's business away from the employer." *Easy Returns*, 964 S.W.2d at 453 (citing *Continental Research*, 595 S.W.2d at 401).

> The goodwill that develops from customer contacts between the salesman or business partner and the company's customer is essential to the company's success and is the reason the employee or the business partner is remunerated. The goodwill that develops results in sales of the company's product or services. Therefore, an employer has a protectable right in both customers and goodwill.

*AEE–EMF, Inc. v. Passmore*, 906 S.W.2d 714, 720 (Mo.App.1995).

▮▮▮▮ "The purpose of the restriction is to keep the covenanting employee out of a situation in which he might be able to make use of contacts with customers to his former employer's disadvantage. If the covenant is lawful and the opportunity for influencing customers exists, enforcement is appropriate." *Osage Glass*, 693 S.W.2d at 75. "The quality, frequency, and duration of an employee's exposure to an employer's customers are crucial in determining the covenant's reasonableness." *Healthcare Services*, 198 S.W.3d at 611.

▮▮▮ The trial court found that plaintiff had regular contact with defendants' customers and prospective customers as part of his job as a dispatcher, that he spoke to prospective customers about handling their commodities, and that he quoted rates to customers and potential customers. The court did not further address customer contacts in its findings. Specifically, the court did not address the quality of those contacts or whether plaintiff developed influence over the customers. In this situation, we will consider the factual issues to have been resolved in accordance with the result reached, and we review the record to determine if there is substantial evidence to support such findings. *Kessler-Heasley*, 90 S.W.3d at 185.

Defendants argue that the required influence was shown by the evidence that plaintiff had significant daily customer contact, that he was the employee with whom the customers dealt, that he was paid more than a clerical employee, and that he had

sent defendants' baseball and hockey tickets to customers. They conclude that the fact that he received a job offer from a competitor demonstrates the value of his customer contacts.

■ An employer must show that the employee had contacts of the kind enabling him to influence customers. *Easy Returns,* 964 S.W.2d at 454. In other words, the opportunity for influencing customers must exist. *Osage Glass,* 693 S.W.2d at 75.

Although the court found, and the record supports, the fact that plaintiff had daily contact with defendants' customers, there is substantial evidence that this contact was not such that it enabled plaintiff to influence customers in the sense that he could entice a customer's business away from defendants. Rather, the evidence showed that in this industry generally, and in defendants' business specifically, the customer's decision to ship with a specific broker was wholly based on rates and was unconnected to the identity of the dispatcher who relayed the rates to the customer and set up the haul.

The customers were shippers who had commodities to be hauled and other brokers who needed a truck for hauls under contract. When customers would call with a load to haul, they would often offer to pay a certain amount per ton for the haul. If the offered rate was the same or higher than the established rate on the defendants' rate sheet, plaintiff could accept it. If it was not, he was required to obtain approval from a head dispatcher or the defendants' president, David Rollet. Plaintiff had contact with 50–100 customers a day. Plaintiff testified that he did not develop personal relationships with any of defendants' customers, and that he was basically "just a voice" on the phone. Plaintiff also testified that he was not aware of any customer or prospective cus-

tomer who was willing to pay a higher rate to give business to defendants simply because plaintiff was the dispatcher setting up the haul. No customers followed him when he left defendants' employ.

Roger Naeger, a former dispatcher and former head dispatcher for defendants, and who worked with plaintiff, testified that he was not aware of any exclusive relationship plaintiff had with any customers, in the sense that any customer would ask to speak with plaintiff or that defendants had designated plaintiff to be the contact person for any customer. Rather, whoever answered the phone took the call, and customers never asked to speak to a particular dispatcher.

Elizabeth Hollenberg and David Hollenberg were the principals of ECO Logistics and Elizabeth Transportation. Ms. Hollenberg testified that she never had a customer follow a dispatcher to a new job, and that customers are looking for someone "to do the best rate." Mr. Hollenberg testified that customers chose ECO Logistics for a haul strictly based on its rate and not because of who the dispatcher was. ECO Logistics never had a customer do business with it because plaintiff was its dispatcher.

Plaintiff testified that he was not aware of any customers who used only defendants to broker their loads. Mr. Naeger also testified that defendants were not the only trucker or broker for any of their customers, and he knew of no customers who dealt exclusively with one trucker or broker. In addition, Ms. Hollenberg testified that she was not aware of any customers that would deal exclusively with one trucking company. She explained that doing so would not be a good business decision because it could prevent that customer from getting the best rate.

Although defendants presented evidence to the contrary, our standard of review requires us to determine if substantial evidence supports the judgment. In this case, there was substantial evidence to support implied findings that defendants' brokerage business did not become associated in a customer's mind with plaintiff and plaintiff did not possess the degree of influence over any customers that would justify enforcement of the Agreement under a "customer contacts" theory.

### B. Trade Secrets

Defendants also argue that the trial court erred in concluding the Agreement was unenforceable because they had a protectable interest in their confidential information, which they identify as their customer list, their rate sheets, and their pricing process. Trade secrets are a legitimate interest that can be protected by a non-compete clause.

A "trade secret" can be " 'any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.' " Kessler–Heasley, 90 S.W.3d at 188 (quoting National Rejectors, Inc. v. Trieman, 409 S.W.2d 1, 18–19 (Mo. banc 1966)).[2] Some factors to be considered in determining whether certain information is a trade secret are:

"(1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others."

Healthcare Services, 198 S.W.3d at 611 (quoting Continental Research, 595 S.W.2d at 400–01). See also National Rejectors, 409 S.W.2d at 18–19. The employer bears the burden to substantiate its asserted interest in its trade secrets. Healthcare Services, 198 S.W.3d at 611. Evidence of purported trade secrets must be sufficiently specific to allow a court to make a determination. Id.

Matters of public knowledge or information that is generally known within a given industry cannot be appropriated as a trade secret. Kessler–Heasley, 90 S.W.3d at 188–89; AEE–EMF, Inc., 906 S.W.2d at 722. "The protection does not extend to knowledge that is the natural product of the employment or known throughout the industry . . . ." Victoria's Secret, 157 S.W.3d at 262.

### 1. The Customer List

We first address whether the Agreement was enforceable to protect against the unfair competitive use of defendants'

---

**2.** The Missouri Uniform Trade Secrets Act defines "trade secret" in section 417.453(4) RSMo (2000) as follows:

(4) "Trade secret", information, including but not limited to, technical or nontechnical data, a formula, pattern, compilation, program, device, method, technique, or process, that:

(a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascer-

tainable by proper means by other persons who can obtain economic value from its disclosure or use; and

(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

This definition has also been used in analyzing trade secrets as a basis for enforcing covenants not to compete. See, e.g., Victoria's Secret, 157 S.W.3d at 262.

customer list. This issue turns on whether the customer list was a trade secret.

■ The trial court found that "defendants did not really have a legitimate and protectable interest in their customer list, as the customer list basically served as a 'phone book' for the business." Defendants argue that the rationale expressed in this finding is insufficient to support the judgment. We agree that the "phone book" reference does not clearly articulate a rationale for upholding the judgment. The internal use of a customer list as a phone book is not determinative of confidentiality. The clause "as the customer list basically served as a phone book for the business" is surplusage. We may strike surplusage from the findings when the remainder of the finding disposes of the controversy. *Craft v. Philip Morris Companies, Inc.*, 190 S.W.3d 368, 377 (Mo. App.2006); *T.L.I. v. D.A.I.*, 810 S.W.2d 551, 554 (Mo.App.1991).

The judgment does not contain any other finding of fact relating to the customer list as a trade secret. Accordingly, we must determine if the record is sufficient to support the conclusion that defendants did not have a protectible interest in their customer list. *Kessler–Heasley*, 90 S.W.3d at 185.

■ Customer lists are protectable as trade secrets only when they represent "a selective accumulation of information based on past selling experience, or when considerable time and effort have gone into compiling it." *Id.* at 188. However, " '[t]o be protected, a customer list must be more than a listing of firms or individuals which could be compiled from directories or other generally available sources.' " *Id.* (quoting *Empire Gas Corp. v. Graham,* 654 S.W.2d 329, 331 (Mo.App.1983)).

■ The customer list consisted of a compilation of customer information that included a customer's name, its location, its phone number, and a contact person. In addition, some of the entries on the list include the type of commodity associated with a particular customer.

Defendants argue that their customer list was a trade secret because there was evidence that it was produced over a twenty-year period with significant time and resources, was maintained as confidential, and, in a fast-paced industry, it reduced the time required for its employees to find a customer's contact information.

While there was evidence that the list met these criteria, there was substantial evidence to support an implied finding that the customer list was nothing more than a listing of firms or individuals that could be compiled from generally available sources. Plaintiff testified that most of the names and phone numbers on defendants' customer list were publicly available. After he left defendants' employ, plaintiff used the list on the website "hoploads.com" to contact shippers. He also testified that he could use the website "switchboard.com" to find the contact person for any particular commodity shipper he wanted to contact.

Mr. Naeger also testified that the information contained in the customer list was available by using other sources. Specifically, telephone listing information services and internet sources provide access to commodity shippers' contact information and addresses. Ms. Hollenberg testified that ECO Logistics used "hoploads.com" and the internet before plaintiff worked for it.

An example of an online list from the "hoploads.com" website was admitted into evidence. "Hoploads.com" was an industry-specific website that offered an online database listing a number of potential loads that needed to be hauled at any

given time. Although it did not contain a potential customer's name, it did contain the location, contact person, and phone number of a potential customer who had a commodity to be shipped. A freight broker, such as Rollet Bros. Logistics, Inc. or ECO Logistics, could use this type of website to find work to bid on. Truckers looking for loads to deliver could also use this list.

This evidence was sufficient to demonstrate that the information in defendants' customer list could be compiled from other, generally available sources. The trial court's conclusion that defendants did not have a protectable interest in its customer list is supported by substantial evidence and did not misapply the law.

2. *The Pricing, Surcharge, and Rate Information*

We next consider whether the Agreement was enforceable to protect against the unfair competitive use of defendants' pricing, surcharge, and rate information.

The trial court found that defendants did not have a protectable interest in the confidentiality of their prices, rates, and surcharges because the information was "general enough and available to anyone that might bother to look for it. There was no secret formula involved...."

Defendants argue that this finding was erroneous because there was evidence that defendants kept their rates and the process for setting them confidential and did not give their rates, surcharges, and pricing information to competitors. Even if defendants kept their rates and process confidential, there was substantial evidence to support the conclusion that the Agreement was not enforceable against plaintiff to protect the rate sheets or pricing process.

As previously stated, an agreement not to compete may only be enforced to protect against the unfair competitive use of trade secrets. *Victoria's Secret,* 157 S.W.3d at 263. An agreement is not enforceable if the employee has not been given confidential information or if the confidential information that the employee has would not give the new employer a competitive advantage over the former employer. *Id.* at 262–3.

We first address the rate sheet. The rate sheet was used by defendants to inform their dispatchers of the rates they were willing to pay or accept for a given load. The rate sheet listed defendants' shipping rate, as well as the amount of their fuel surcharges. The rate sheets were kept in the computer. Mr. Rollet set the rates on the rate sheet. Rates on the rate sheet were adjusted at varying times; some monthly, some every three months, some every six months, some annually, and some might not change. In addition, when defendants bid on a haul, the bid amount would be entered into the system as an established rate. The fuel surcharges were a percentage of the rate. Depending on the price of fuel and other factors, the fuel surcharge could change as often as daily and could vary as much as three or four percent over the course of a week.

Plaintiff was given the rate sheets while he was employed. The determinative issue is whether the information on the rate sheet was a trade secret that could be protected after plaintiff ended his employment with defendants.

In *National Rejectors,* the Missouri Supreme Court, sitting en banc, set out the definition of trade secret from the Restatement of Torts section 757 (1934), as representing a consensus view. 409 S.W.2d at 18–19. A long line of Missouri cases has since quoted and applied all or parts of this definition.[3]

**3.** *See, e.g. Healthcare Services,* 198 S.W.3d at 611; *Kessler–Heasley,* 90 S.W.3d at 188;

The Restatement definition set out in *National Rejectors* specifically distinguishes a trade secret from information that may be confidential, but only has value for a short time.

"It differs from other secret information in a business (see § 759) in that it is not simply information as to single or ephemeral events in the conduct of the business, as, for example, the amount or other terms of a secret bid for a contract or the salary of certain employees, or the security investments made or contemplated, or the date fixed for the announcement of a new policy or for bringing out a new model or the like. A trade secret is a process or device for continuous use in the operation of the business. Generally it relates to the production of goods, as, for example, a machine or formula for the production of an article. It may, however, relate to the sale of goods or to other operations in the business, such as a code for determining discounts, rebates or other concessions in a price list or catalogue, or a list of specialized customers, or a method of bookkeeping or other office management."

*National Rejectors,* 409 S.W.2d at 19 (quoting Restatement of Torts section 757 (1934)). The reason that confidential, but short-lived, information is not a trade secret is because once it expires, it has no value to a competitor. *Victoria's Secret,* 157 S.W.3d at 263.

In *Victoria's Secret,* the former employer claimed as trade secrets certain confidential reports which were replaced or updated weekly, monthly, or at most every six months. The former employee had access to these while he was employed. We held the trial court could reasonably have found that while these reports may have been valuable to a competitor when they were issued, they had a relatively short useful life. 157 S.W.3d at 263. We held that the trial court's finding that any confidential employer business information known to the former employee would not give the new employer a competitive advantage over the former employer was supported by substantial evidence. *Id.*

Here, the information contained on the rate sheet was not a process or device for continuous use in the business; rather, it consisted of frequently changing rates and fuel surcharges. Although plaintiff had access to these while he was employed, the information was soon outdated. By its very nature, defendants' rate sheet was not a trade secret and would not give a future employer a competitive advantage. As a matter of law, the Agreement is not enforceable to protect defendants' rate sheet.

■ We next consider the pricing process. Such a process can be a trade secret. *National Rejectors,* 409 S.W.2d at 19. We do not reach the question whether there was sufficient evidence to establish that defendants' pricing process was a trade secret, because there was substantial evidence that plaintiff was not involved in setting the rates quoted to customers, which the trial court explicitly found, and that the process or basis for setting rates was never disclosed to plaintiff. Since plaintiff was not privy to defendants' pricing process, the Agreement is not enforceable against him to protect that information. *See Victoria's Secret,* 157 S.W.3d at 262–3.

The Agreement is not enforceable against plaintiff to protect defendants' customer contacts or trade secrets in the form of a customer list, rate sheet, or pricing process. Point one is denied.

*AEE–EMF, Inc.,* 906 S.W.2d at 722; *Continental Research,* 595 S.W.2d at 400–01.

*Conclusion*

We have resolved the issues on narrower grounds than the trial court did, which has made some of the trial court's findings and conclusions superfluous. Accordingly, we modify the trial court's judgment by deleting as surplusage the following: (a) the words "as the customer list basically served as a 'phone book' for the business" from Finding 9; (b) Findings 16 and 17; and (c) Conclusions 18 and 19. The judgment of the trial court is affirmed as so modified.

MARY K. HOFF, J. and KENNETH M. ROMINES, J., concur.