# IN THE COURT OF APPEALS OF IOWA

No. 13-1555
Filed December 24, 2014

CURRY'S TRANSPORTATION SERVICES,
INC.,
      Plaintiff-Appellant,

vs.

MIKE DOTSON, ERIC RYNER, JUSTIN
CRAIG SHAFER, and RYNER
TRANSPORTATION, INC.,
      Defendants-Appellees.

_____

Appeal from the Iowa District Court for Muscatine County, Joel W. Barrows, Judge.

Curry's Transportation Services, Inc. appeals from the judgment dismissing its claims of civil conspiracy, breach of contract, and intentional interference with business relationships. **AFFIRMED.**

Thomas E. Maxwell and Michael J. Harris of Leff Law Firm, L.L.P., Iowa City, for appellant.

Jason J. O'Rourke and Benhamin J. Patterson of Lane & Waterman, L.L.P., Davenport, for appellees.

Heard by Mullins, P.J., and Bower and McDonald, JJ.

**MCDONALD, J.**

This case involves a dispute between a trucking company, Curry's Transportation Services, Inc. (hereinafter "CTS"), and three of its former employees/contractors who left CTS's service and started competing in the industry. Following a bench trial, the district court dismissed CTS's claims for breach of contract, intentional interference with business relationships, and civil conspiracy.

I.

CTS is a trucking company based in eastern Iowa. It has approximately 125 employees, 90 of which are drivers. In addition to its employee drivers, CTS's fleet includes independent owner/operators who lease their respective trucks to CTS for CTS's use. Approximately eighty percent of the independent owner/operators operate under CTS's authority and Department of Transportation (hereinafter "DOT") number while twenty percent operate under their own authority and DOT number. Jason Curry ("Curry") is an owner of CTS and has served as the vice-president of operations since the company's inception.

Eric Ryner worked at CTS as an employee driver from 2002 through 2003 and from 2006 through 2008. In September 2008, Ryner purchased his own truck and formed Ryner Transportation, Inc. (hereinafter "RT"). Ryner and RT entered into an "independent contractor operating agreement" with CTS and leased the truck to CTS as an owner/operator under CTS's authority and DOT number. Several months later, in December 2008, Ryner and RT signed a new

operating agreement with CTS that contained certain restrictive covenants, including the non-compete provision at issue in this proceeding. In December 2009, RT began operating under its own authority and DOT number but still hauled freight solely for CTS. Ryner and RT were not asked to sign a new operating agreement at this time. However, as will be discussed below in more detail, CTS, Ryner, and RT started operating under new terms. Ryner and RT discontinued hauling for CTS on August 9, 2012.

After Ryner left CTS, he began hauling for some companies he had previously hauled for while at CTS. This included Winegard, a satellite antenna manufacturing company, which paid a very profitable rate due to the time-sensitive nature of its operations. Before Ryner and RT left CTS, RT used to receive the majority of the Winegard routes at the request of Winegard. Soon after Ryner and RT left CTS, Winegard discontinued all shipping with CTS and transferred most of that shipping business to RT.

Mike Dotson worked for CTS for seven years—six of those as operations manager and Curry's "right hand man." As the operations manager, Dotson procured new customers for CTS and managed CTS's existing customer relationships. He also worked on pricing strategies with Curry and helped negotiate rates with customers. On August 25, 2008, Dotson signed a confidentiality agreement with CTS that contained non-compete and non-solicitation provisions. Dotson testified that nothing about his job changed after signing this agreement. Before he had signed the agreement, the record showed

nothing would have prevented Dotson from working for a new company and disclosing CTS's customer and pricing information.

Dotson notified CTS in late July 2012 that he was leaving its employment; he took a job as a dispatcher with RT beginning in August 2012. On the day Dotson left CTS, Dotson signed a resignation letter presented to him by Curry in which Dotson agreed "not to accept any employment where I will compete directly or indirectly for the next year with [CTS]." Dotson did not receive any compensation or other benefit for signing the resignation letter. On the day Dotson left CTS, he called four CTS customers, including Winegard, to tell them he was leaving CTS's employment. Of the four customers, Dotson told only Winegard that he was going to work for RT. Dotson testified Winegard was the only customer who asked about Dotson's employment plans.

Justin Craig Shafer worked for CTS as a dispatcher from 2006 through 2008 and later rejoined CTS in the same role in late 2010. During his first employment with CTS, Shafer was not subject to any restrictive covenants. In 2010, Curry offered to rehire Shafer on the condition Shafer sign a confidentiality and non-compete agreement. Shafer refused to do so, but Curry hired him anyway. At trial, CTS contended Shafer had in fact signed such an agreement, but no such agreement was offered into evidence. During his second employment with CTS, Shafer had access to the same customer and pricing information he previously had. Shafer quit CTS without notice on August 9, 2012, and began working at RT as a dispatcher on August 13, 2012. Four months later, Shafer became RT's operations manager.

Ryner, Dotson, and Shafer agree they met at a Perkins restaurant in April 2012 at Shafer's invitation. The purpose of the meeting was to discuss Shafer's unhappiness at CTS and his desire for him and Ryner to "go out on their own." Dotson was invited to join them because Shafer knew Dotson was unhappy at CTS. While no firm agreement was made during that initial meeting, the parties stayed in contact during the next several months during which Ryner obtained financing to run his own company.

CTS filed suit against Ryner, RT, Dotson, and Shafer, asserting claims for conspiracy, breach of contract, and intentional interference with business relationships. On the breach of contract claims, the district court found and concluded as follows: (1) CTS and Shafer did not enter into any non-competition or non-solicitation agreement; (2) CTS, Ryner, and RT abandoned the 2008 independent contractor agreement that contained the restrictive covenants at issue; (3) Dotson was subject to restrictive covenants; and (4) any restrictive covenants were unenforceable because they were not reasonably necessary to protect CTS's business. On the interference with existing business relationship claims, the district court found and concluded that CTS failed to establish it had contractual relations with its customers and that the appellees interfered with each other's agreements. On the interference with prospective business relationships claims, the district court found and concluded that CTS failed to prove an intentional and improper interference with any of CTS's customers.

II.

The parties contest the applicable standard of review. CTS argues de novo review is required because the action was tried in equity, as evidenced by CTS's request for injunctive relief. *See East Oaks Dev., Inc. v. Iowa Dep't of Transp.,* 603 N.W.2d 566, 567 (Iowa 1999) (finding "[a] request for injunctive relief invokes the court's equitable jurisdiction" and review is thus de novo). The appellees argue the action was tried at law, and the required standard of review is for corrections of errors at law.

"'The essential character of the cause of action and the remedy or relief it seeks, as shown by the allegations of the complaint, determine whether a particular action is at law or in equity.'" *Mosebach v. Blythe*, 282 N.W.2d 755, 758 (Iowa Ct. App. 1979) (citation omitted). Where "both legal and equitable relief are demanded, the action is ordinarily classified according to what appears to be its primary purpose or its controlling issue." *Id.* A request for injunctive relief is not dispositive of the issue because injunctive relief is available in equity and available as an auxiliary remedy at law. *See Harrington v. Univ. of N. Iowa*, 726 N.W.2d 363, 365 (Iowa 2007) (stating "'the fact that injunctive relief was sought is not dispositive of whether an action is at law or in equity, as an injunction may issue in any action'" (citation omitted)).

It is clear the essential character of the present action is at law and that the action was actually tried at law. CTS's petition was filed at law. CTS's primary claim was an action on contract seeking monetary relief. *See Mosebach*, 282 N.W.2d at 758. ("[W]here the primary right of the plaintiff arises from the

nonperformance of a contract, where the remedy is monetary in nature, and where monetary damages are full and certain, remedies are usually provided by actions at law and equity has no jurisdiction."). The district court tried the action at law, ruling on all evidentiary objections made during the course of trial. *See Sutton v. Iowa Trenchless, L.C.*, 808 N.W.2d 744, 748 (Iowa Ct. App. 2011) (noting that, in determining whether a declaratory judgment action was tried at law or equity, "[w]hether the court ruled on evidentiary objections is also an important consideration, though it is not dispositive").

Because CTS's claims were tried at law, our review is for correction of errors at law. "'The trial court's findings have the effect of a special verdict and are binding if supported by substantial evidence.'" *Arnevik v. Univ. of Minn. Bd. of Regents*, 642 N.W.2d 315, 318 (Iowa 2002) (citation omitted). "'Evidence is substantial when a reasonable mind would accept it as adequate to reach a conclusion.'" *Id.* (citation omitted). "In determining whether substantial evidence exists, we view the evidence in the light most favorable to the district court's judgment." *Chrysler Fin. Co. v. Bergstrom*, 703 N.W.2d 415, 418 (Iowa 2005).

III.

A.

The trial court found the 2008 operating agreement between CTS, Ryner, and RT was abandoned in December 2009 when Ryner began operating under his own authority. CTS challenges this finding. "Abandonment of a valid contract may be accomplished by express agreement of the parties, or the parties, by conduct inconsistent with the continued existence of the original contract, may

estop themselves from asserting any right thereunder." *Iowa Glass Depot, Inc. v. Jindrich*, 338 N.W.2d 376, 380 (Iowa 1983). Because there was no express agreement to abandon or terminate the contract, "we must examine both the acts of the parties and the contract itself to determine whether the parties unequivocally and decisively relinquished their rights under the covenant." *Id.* "Whether or not there was an abandonment or mutual rescission of the contract between the parties is wholly a question of fact." *Perrin v. Chidester*, 139 N.W. 930, 932 (Iowa 1913).

When viewed in the light most favorable to the district court's judgment, there is substantial evidence CTS, Ryner, and RT abandoned the December 2008 operating agreement when Ryner began operating under his own authority in December 2009. There were numerous substantive changes made to the parties' relationship. *See, e.g., Honda v. Reed*, 319 P.2d 728, 731 (Cal. Ct. App. 1958) ("Abandonment of a contract may be implied from the acts of the parties in negotiating for a new and different contract concerning the same property or subject matter."). For example: Ryner operated under his own DOT number, not CTS's; Ryner became responsible for obtaining fuel permits and reporting fuel tax to state taxing authorities; CTS placards and DOT numbers were no longer attached to RT's trucks; Ryner no longer had to turn log books into CTS; Ryner became responsible for providing his own liability insurance; Ryner's rate of pay for CTS loads increased from 75% to 80%; and compensation to Ryner had to be paid within thirty days as opposed to fifteen. Regarding the change in the timing of the payout of compensation, the district court correctly noted CTS was

required to pay Ryner within fifteen days if the two parties were governed under a leasing agreement. *See* 49 C.F.R. § 376.12(f)).

In addition, the December 2008 operating agreement applied to only one truck. At the time Ryner and RT ceased business with CTS, Ryner had five trucks in operation subject to the new terms discussed in the preceding paragraph. *See, e.g.*, *Interior/Exterior Specialist Co. v. Devon Indus. Grp., LLC*, No. 276620, 2009 WL 49616, at *6 (Mich. Ct. App. Jan. 8, 2009) (holding substantial evidence supported finding abandonment of contract where parties performed work outside the scope of the original contract and generally acted inconsistently with the terms of the original contract). As further evidence of the intent to abandon the prior agreement, Curry admitted CTS does not require owner/operators working under their own authority to sign an operating agreement similar to the 2008 agreement Ryner signed when operating under CTS's authority.

The applicable standard of review is largely dispositive of CTS's claim. "'Evidence is not insubstantial merely because we may draw different conclusions from it; the ultimate question is whether it supports the finding actually made, not whether the evidence would support a different finding.'" *Bergstrom*, 703 N.W.2d at 418 (citation omitted). "It is a question of fact whether a contract has been abandoned." *Iowa Chem. Corp. v. W.R. Grace & Co.*, 715 F.2d 393, 396-97 (8th Cir. 1983) (finding both parties "simply ignored the[ir] contract" when neither party "actively exercised any of their respective rights nor performed any of their respective obligations" under the original contract).

When viewed in this light, the record supports the district court's finding of abandonment.

B.

The district court also concluded the restrictive covenants, assuming they were in force, were unenforceable as not reasonably necessary to protect CTS's business. CTS challenges this determination. In deciding whether to enforce restrictive covenants, courts apply a three-part test:

1) "Is the restriction reasonably necessary for the protection of the employer's business;
2) Is it unreasonably restrictive of the employee's rights; and
3) Is it prejudicial to the public interest?"

*Revere Transducers, Inc. v. Deere & Co.*, 595 N.W.2d 751, 761 (Iowa 1999) (citation omitted). "The burden of proving reasonableness is upon the employer who seeks to enforce such a covenant." *Jindrich*, 338 N.W.2d at 381. "Factors we consider in determining the enforceability of a noncompete agreement include the employee's close proximity to customers, the nature of the business, accessibility to information peculiar to the employer's business, and the nature of the occupation which is restrained." *Revere,* 595 N.W.2d at 761*.*

CTS's custom and practice with respect to its driving force is evidence that restrictive covenants are unnecessary to protect the business. *See, e.g.*, *Am. Equity Mortg., Inc. v. First Option Mortg. LLC*, No. 4:06CV1167 CDP, 2006 WL 3032417, at *5 (E.D. Mo. Oct. 23, 2006) (noting that employer's past practice of not protecting business through enforcement of non-competition agreements is evidence such agreements are not necessary to protect the business). Curry testified he does not require employee drivers to sign restrictive covenants.

Curry testified he does not require other owner/operators working under their own authority to sign restrictive covenants. Curry admitted he has nothing in place to prevent employee drivers or owner/operators working under their own authority from leaving CTS and going to work for a competitor.

The record also shows that the nature of CTS's information does not require protection. *See Jindrich*, 338 N.W.2d at 382 (noting a restrictive covenant would be justified when the employee gained "peculiar knowledge" of the employer's business). Curry testified that the identity of CTS customers is not a secret. He testified CTS does not have a confidential or proprietary pricing formula. Instead, many different factors are relevant to pricing, including CTS's overhead, the origination and destination point of any particular load, the value of the load, the size and type of load, fuel costs, the urgency of the delivery, etc. Other than the specific cost of CTS's overhead, which would be irrelevant to CTS's competitors, these are the same factors used by every other trucking company in pricing decisions. Most important, Curry also noted pricing is often determined by the customer. Often a customer will call and ask CTS if it can deliver a load for "x" amount of dollars. Often, a request for work will be posted electronically on a website or disseminated by a broker. Several witnesses testified that rates are generally standard across the trucking industry and widely known.

In sum, the evidence showed the trucking industry is a largely commoditized industry. Customers typically use multiple trucking companies in non-exclusive relationships for their freight and logistics needs. Business is price

and time sensitive and not dependent upon personal contacts and relationships or confidential information. Customer information, including CTS's customer information, is widely known. Pricing information, including CTS's pricing information, is widely known. Moreover, pricing is largely standardized. Further, CTS has a custom and practice of not requiring restrictive covenants to protect its business. Substantial evidence supports the trial court's decision. *See, e.g., Instant Tech., LLC v. DeFazio*, No. 12 C 491, 2014 WL 1759184, at *15 (N.D. Ill. May 2, 2014) (holding non-solicitation provision unenforceable where employer had non-exclusive relationship with its customers and industry was largely commoditized); *Brown v. Rollet Bros. Trucking Co.*, 291 S.W.3d 766, 774-79 (Mo. Ct. App. 2009) (finding trucking company's use of restrictive covenants to prevent disclosure of customer list and pricing information was not reasonably necessary to protect business).

C.

We next address CTS's claim for intentional interference with business relationships. At trial, CTS asserted claims for intentional interference with existing and prospective business relationships. On appeal, CTS challenges only the district court's findings and conclusions regarding CTS's claim for interference with the appellees' restrictive covenants. As to that claim, the district court found and concluded the claim failed because CTS failed to establish enforceable contracts or wrongful interference. On substantial evidence review, we agree that CTS failed to establish an interference with existing contracts. *See Kern v. Palmer Coll. of Chiropractic*, 757 N.W.2d 651, 662 (Iowa 2008) (stating to

recover for intentional interference with an existing contract, the plaintiff must show the plaintiff had a contract with a third-party).

D.

We turn now to CTS's claims for civil conspiracy.[1] "'[A] conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose, or to accomplish by unlawful means some purpose not in itself unlawful.'" *Wright v. Brooke Grp. Ltd.*, 652 N.W.2d 159, 171 (Iowa 2002) (citation omitted). Mere preparation to form a competing business organization is not actionable "unless it is shown that something in the preparation to compete produced a discrete harm to the former business beyond the eventual competition that results from the preparation." *Midwest Janitorial Supply Corp. v. Greenwood*, 629 N.W.2d 371, 376 (Iowa 2001).

We conclude the judgment is supported by substantial evidence. First, CTS is unable to show the appellees sought to accomplish an unlawful purpose. The district court found none of the parties had enforceable restrictive covenants. Therefore, nothing prohibited them from leaving to work for another company or from leaving to start their own operation. Second, CTS was unable to show a discrete harm to CTS from Dotson, Ryner, RT, or Shafer's conduct. While it is true CTS lost Winegard as a client following the appellees' departure, there was no evidence regarding how and why Winegard ceased using CTS. CTS did not

---

[1] CTS argues on appeal that appellees conspired, in part, to breach fiduciary duties owed by Dotson and Shafer to CTS. This is not an argument CTS made before the district court, and we will not address it on appeal. *See State v. Rutledge,* 600 N.W.2d 324, 325 (Iowa 1999) ("Nothing is more basic in the law of appeal and error than the axiom that a party cannot sing a song to us that was not first sung in trial court.").

14

call any representative of Winegard as a witness. The record only showed that Winegard showed a strong preference for using RT when Ryner was with CTS and that Winegard continued that relationship. There is no showing of discrete harm beyond the competitive harm.

IV.

We have considered each of the parties' respective arguments, whether set forth explicitly herein. The standard of review is largely dispositive of this appeal; the district court's judgment is supported by substantial evidence and must be affirmed.

**AFFIRMED.**